3 P.3d 1064

**ENTERPRISE LEASING COMPANY OF PHOENIX, a Nevada corporation, Plaintiff–Appellant,**

v.

**Rich EHMKE, a single man, Defendant–Appellee.**

**No. 1 CA–CV 99–0046.**

Court of Appeals of Arizona, Division 1, Department C.

Dec. 2, 1999.

Review Denied May 23, 2000.

DeConcini McDonald Yetwin & Lacy, P.C. by Jeffrey R. Simmons, Phoenix, for the Plaintiff–Appellant.

Gregory W. Dawson, Phoenix, for the Defendant–Appellee.

## OPINION

EHRLICH, Judge.

¶ 1 This appeal arises out of the denial of a permanent injunction against a company's former employee from misappropriating trade secrets. We agree with Enterprise Leasing Company of Phoenix ("Enterprise") that the trial court erred in finding that the Enterprise financial records and other documents at issue were no longer trade secrets, if they had been, and, thus, that they are not entitled to protection from disclosure by Rich Ehmke, Enterprise's former employee. We conclude instead that the documents constitute proprietary and confidential information and should be afforded trade-secret protection. As such, Ehmke must be enjoined from the disclosure and use of these documents. We therefore reverse the trial court's denial of a permanent injunction, and we remand the case for entry of appropriate relief.

### FACTUAL AND PROCEDURAL HISTORY

¶ 2 Ehmke worked for Enterprise in Maricopa County from January 22, 1996, until he was terminated eight months later. As a senior-level manager, Ehmke had access to substantial and proprietary confidential corporate business and financial information concerning Enterprise's market strategy, training methods, and internal financial and operations data. Given his exposure to such information, Ehmke's employment agreement contained a nondisclosure provision, as well as a covenant not to compete. The agreement stated in relevant part that Ehmke:

will not at any time ... take, disclose, misappropriate or misuse any marketing plans, client list, name, file, book, record, or account or other information or confidential data used at or in any of the businesses managed or owned by [Enterprise]. [He] agrees that any ... trade secrets developed by [him] during the course of [his] employment ... become the exclusive property of [Enterprise].

¶ 3 Nonetheless, upon Ehmke's termination, Enterprise discovered that he had

absconded with 45 confidential documents comprising Enterprise's strategic plans, programs, methods and approaches. According to Thomas McKinley, Vice President and General Manager of Enterprise, 35 of these documents contained proprietary and confidential information which, if disclosed, would be advantageous to competitors.[1] Enterprise demanded that Ehmke return these documents immediately. Instead, Ehmke only returned photocopies of the documents, claiming that he had destroyed the originals.[2]

¶ 4 Shortly thereafter, Ehmke formed a rental-car consulting firm in Phoenix. In this manner, he blatantly competed with Enterprise, indeed soliciting Enterprise customers and employees with the intent to recruit them for his new business.

¶ 5 On December 17, 1996, the trial court granted Enterprise's motion for a temporary restraining order against Ehmke, prohibiting him from soliciting Enterprise customers and employees, divulging trade secrets and otherwise engaging in direct competition with Enterprise.

¶ 6 Not for a year did the trial court conduct a preliminary injunction hearing. Then it found that, not only had Ehmke enjoyed access to confidential business and financial information, but that he had later successfully used this information to compete against Enterprise in Maricopa County.[3] On April 2, 1997, the court granted a preliminary injunction to bar Ehmke from continuing and future breaches of his employment agreement.

¶ 7 In July 1997, undeterred by the preliminary injunction, Ehmke became Vice President of the Western United States for Premier Car Rental ("Premier"), a subsidiary of Budget Rent–A–Car ("Budget") and a direct competitor of Enterprise. In this position, he supervised Premier's Arizona branch offices, including those in the Phoenix area. When it became aware of Ehmke's position, Enterprise subpoenaed those of its documents Ehmke had disclosed to Premier.

¶ 8 In February 1998, Enterprise sought a permanent injunction against Ehmke. During the trial, Ehmke admitted that he knowingly had contravened the preliminary injunction by accepting employment with Premier and disclosing to it confidential documents.[4] He also conceded that he had instituted procedures similar to those at Enterprise, and he further acknowledged that he had prepared and distributed documents similar to ones he had drafted at Enterprise. Ehmke claimed, however, that these documents did not qualify as protectable trade secrets because they were common knowledge and not kept secret by Enterprise. Enterprise countered that the documents did indeed contain trade secrets and other confidential material about its operations and referral sources. McKinley related that, aside from some changes in graphic art, Ehmke's documents bore a strong resemblance to Enterprise's materials to the extent that they were not identical.

¶ 9 The trial court concluded simply "that the [Enterprise] forms do not constitute a

---

1. These documents included (1) year-to-date fiscal activities by branch office, (2) revenue per car for each branch office, (3) number of vehicles per branch office, (4) ancillary sales activities, (5) analysis of each branch office's productivity, (6) operating plans for the fiscal year, (7) expansion plans, (8) market-by-market break-even points, (9) gross revenue and costs on an area basis, (10) number of rental vehicles per branch office, (11) rental revenue derived from daily rates and ancillary sales, (12) profitability statements on a per unit basis, (13) fleet size, (14) overall profitability, and (15) a "Customer Service Worksheet" described below.

2. At the hearing for the preliminary injunction on January 23, 1997, Ehmke testified to the contrary, that is, that he had intended to keep the documents as a reference.

3. Ehmke readily admitted to violating the covenant not to compete. He stated that he had contacted various Enterprise customers, account holders and employees.

4. Ehmke admitted at trial that he had in fact disclosed the same confidential customer lists to Budget and Premier that, during the proceedings for the preliminary injunction, he had testified he had destroyed. Two documents, Enterprise's "Daily Rental 14 Month Account Analysis" and a list of important Enterprise accounts, Ehmke claimed to have found in his briefcase in June 1997, but, instead of returning them to Enterprise, he gave them to Premier's Arizona manager.

trade secret" and denied the permanent injunction. It subsequently denied Enterprise's motion for reconsideration and entered judgment in favor of Ehmke.

¶ 10 The dispositive issue on appeal is whether the Enterprise documents are trade secrets and thus entitled to protection according to the nondisclosure provision in the employment agreement. Two sets of documents are in question: The first concerns Enterprise's internal financial information. The second, the Enterprise Rent–a–Car Customer Service Worksheet ("Worksheet"), encompasses general business principles involved in the operation of a successful car rental branch office.[5]

## DISCUSSION

¶ 11 While we are bound by the trial court's findings of fact unless they are clearly erroneous, *Lee Dev. Co. v. Papp*, 166 Ariz. 471, 475, 803 P.2d 464, 468 (App.1990), we review questions of law de novo. *Scottsdale Princess Partnership v. Maricopa County*, 185 Ariz. 368, 372, 916 P.2d 1084, 1088 (App.1995). Thus, we are not constrained by the legal conclusions from facts found or inferred in the judgment of the trial court nor by findings of the trial court in questions of law or mixed questions of law and fact. *Huskie v. Ames Bros. Motor & Supply Co.*, 139 Ariz. 396, 401, 678 P.2d 977, 982 (App.1984).

¶ 12 This case presents questions involving the interpretation and application of the trade-secret statute. Trade-secret law is traditionally within the realm of state law. *See Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 265–66, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). Like the majority of states, Arizona has adopted the Uniform Trade Secrets Act ("UTSA"), which codifies the basic principles of common-law trade-secret protection, to govern the resolution of trade-secret issues. UNIF. TRADE SECRETS ACT §§ 1–11 (1985), *reprinted in* Paul Goldstein et al.,

AGREEMENTS ON UNFAIR COMPETITION, TRADE-MARK, COPYRIGHT AND PATENT 16 (1994). In addition, Arizona also recognizes the Restatement of Torts in the absence of controlling authority. *See Chanay v. Chittenden*, 115 Ariz. 32, 38–39, 563 P.2d 287, 293–94 (1977); *Wright v. Palmer*, 11 Ariz.App. 292, 294, 464 P.2d 363, 365 (1970).

¶ 13 Trade-secret law is unusual to the extent that it provides protection to the owner of a trade secret, but only while the information and knowledge remains a secret. *See* Ruth E. Leistensnider, Comment, *Trade Secret Misappropriation: What is the Proper Length of an Injunction After Public Disclosure?*, 51 ALBANY L.REV. 271, 272 (1987). The threshold determination whether to protect information as a trade secret therefore depends upon the nature of the information and the circumstances surrounding its secrecy and the maintenance thereof. *B.C. Ziegler and Co. v. Ehren*, 141 Wis.2d 19, 414 N.W.2d 48 (1987).

¶ 14 By definition, a trade secret is not simply information as to single or ephemeral business events. *See* Roger M. Milgrim, MILGRIM ON TRADE SECRETS § 1.01[1] 1–18 (1999). Rather, a trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it. *See* ARIZ.REV. STAT. ANN. ("A.R.S") § 44–401(4)(a); RESTATEMENT OF TORTS § 757 cmt. b (1939). The Arizona Trade Secrets Act defines "trade secret" as follows:

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that both:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons

---

5. The Worksheet includes market attributes; office *appearance and traffic flow*—exterior and interior; personnel attributes; leadership attributes in delegation, planning, organization and management; car condition and preparation; cycle of service at the telephone, pick-up process, branch arrival, rental contract, car, callback and vehicle return *stages*; and problem resolution. Each of these sections also detailed further criteria and provided lines for general written comments.

who can obtain economic value from its disclosure or use.

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44–401. This rather expansive definition emphasizes the secrecy of the alleged trade secret, as well as the competitive advantage afforded by it. *See* Bruce T. Atkins, *Trading Secrets in the Information Age: Can Trade Secret Law Survive the Internet?*, 1996 U. ILL. L.REV. 1151, 1156; *Avtec Systems, Inc. v. Peiffer*, 21 F.3d 568, 575 (4th Cir.1994).[6]

▌ ¶ 15 Because the hallmark of a trade secret obviously is its secrecy, not only must the subject-matter of the trade secret be secret, it must be of such a nature that it would not occur to persons in the trade or business. *Wright*, 11 Ariz.App. at 295, 464 P.2d at 366; *see* A.R.S. § 44–401(4)(a). Accordingly, matters that are public knowledge are not safeguarded as trade secrets. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1199 (5th Cir. 1986); *Zoecon Industries v. American Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983). Information is considered public knowledge if it is available in trade journals, reference books or published materials, or if it is known to principal trade persons who can obtain an economic benefit from the information and are aware that the information is not a trade secret. UNIF. TRADE SECRETS ACT § 1 cmt. (1985).

▌ ¶ 16 In particular, when a process or idea is so common or widely known that it lacks all novelty, uniqueness and originality, it necessarily lacks the element of privacy required to make it legally cognizable as a trade secret. *See Cockerham v. Kerr–*

*McGee Chemical Corp.*, 23 F.3d 101, 105 (5th Cir.1994), *citing Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315 (5th Cir.1971). Although the subject-matter of a trade secret need not rise to the level of novelty to the degree that it does in patent law, the information must be sufficiently novel such that it is not readily ascertainable to the competitors in an industry. *See Kewanee Oil Co.*, 416 U.S. at 476, 94 S.Ct. 1879; A.R.S. § 44–401(4)(a). Indeed, to allow the protection of material in the public domain would contradict the very purpose of trade-secret law, which is to protect valuable confidential information from discovery. *See Kewanee Oil Co.*, 416 U.S. at 481–84, 94 S.Ct. 1879; *Buffets, Inc. v. Klinke*, 73 F.3d 965, 968 (9th Cir.1996).

▌ ¶ 17 Although matters of general knowledge cannot be appropriated as secret, a trade secret may consist of a combination of elements even though each individual component may be a matter of common knowledge. *See Kewanee Oil Co.*, 416 U.S. at 481–84, 94 S.Ct. 1879; *Rivendell Forest Products, Ltd. v. Georgia–Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir.1994). Specifically, a trade secret may include a grouping in which the components are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it. *See Rivendell Forest Products*, 28 F.3d at 1046. Thus, a compilation of general concepts may amount to a trade secret, and the analysis therefore depends on whether the end-product qualifies as a trade secret. *See Buffets*, 73 F.3d at 968.

▌ ¶ 18 Enterprise's financial documents include sensitive internal economic records concerning its branch offices in Maricopa County, such as profit and loss figures,

---

6. The Restatement adopts a six-factor test to determine whether a trade secret exists: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. RESTATEMENT OF TORTS § 757 cmt. b. On occasion, the last two factors have been included as part of the first four. *See Cherne Industrial Inc. v. Grounds & Assoc.*, 278 N.W.2d 81, 90 (Minn.1979); Leistensnider, *supra*, at 275. Although these tests are not required by the UTSA, they provide additional guidance.

break-even points and sales revenue.[7] Although Ehmke baldly asserts that this information is so stale as to preclude protection, trade-secret status may continue indefinitely so long as there is no public disclosure. *See Kewanee Oil Co.*, 416 U.S. at 476, 94 S.Ct. 1879; *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir.1982); *Amex Dist. Co. v. Mascari*, 150 Ariz. 510, 517, 724 P.2d 596, 603 (App.1986); Robert P. Merges et al., INTELLECTUAL PROPERTY IN THE NEW TECHNOLOGICAL AGE 59 (1997). Thus, secrecy may still attach to proprietary financial information.

¶ 19 Additionally, a document such as the Worksheet reflects a substantial market-research investment by Enterprise delineating several factors helpful to managing a successful branch office. As said above, a compilation need only be a slight advance over common knowledge to receive protection. *Compare Henry Hope X–Ray Products, Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1340 (9th Cir.1982), *with Buffets*, 73 F.3d at 968. Taken out of context, the information in the Worksheet may, as Ehmke maintains, appear to consist only of the general knowledge of those persons in the car-rental industry. However, the Worksheet as a whole is an original product containing an arrangement of factors that provides Enterprise with a competitive advantage. *See Buffets*, 73 F.3d at 968. Because the compilation of customer-service factors represents originality in managing a car-rental business, the Worksheet is unique to Enterprise.

¶ 20 We recognize that not every commercial secret qualifies as a trade secret. Only those secrets affording a demonstrable competitive advantage may properly be considered a trade secret. *Wright*, 11 Ariz.App. at 295–96, 464 P.2d at 366–67. Value will be inferred if the owner can show that the information confers upon it an economic advantage over others in the industry. *Rivendell Forest Products*, 28 F.3d at 1046.

¶ 21 These documents provide economic value for Enterprise and would allow a competitor to gain an advantage if the documents were discovered in the marketplace. For instance, a competitor would have a detailed account of Enterprise's financial data that might be used to affect the placement of branch offices and/or pricing and sales decisions. The Worksheet could provide a competitor with a blueprint of the Enterprise customer-service principles.

¶ 22 Just as the trade secret's owner is obliged to establish that the matter is secret, it must also show that it exercised reasonable care to safeguard the secret. A.R.S. § 44–401(4)(b). Indeed, the most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information. Michael A. Epstein & Stuart D. Levi, *Protecting Trade Secret Information*, 43 BUS. LAW. 887, 895 (1988); *see* A.R.S. § 44–401(4)(b). As many courts have explained, a business that takes only scant precautions in guarding the confidentiality of the secret will not receive protection. Epstein & Levi, *Protecting Trade Secret Information*, 43 BUS. LAW at 895.

¶ 23 The secrecy need not, however, be absolute. *Henry Hope X–Ray Products*, 674 F.2d at 1340. Rather, when evaluating the level of secrecy required, the owner need only be able to show that it made reasonable efforts to maintain the secrecy of the information such as to ensure that it would be difficult for others to discover the information without using improper means. *Id.; K–2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 474 (9th Cir.1974). Reasonable efforts do not require extreme and unduly expensive procedures to be taken to protect trade secrets against industrial espionage, *E.I. duPont de Nemours & Co. v. Christopher*, 431 F.2d 1012, 1016 (5th Cir.1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971), and the owner of a trade secret does not relinquish its secret by disclosure to employees on a necessary basis or by limited publication for a restricted purpose. *Metallurgical Industries*, 790 F.2d at 1200. To hold otherwise would greatly hinder the owner's ability to profit from its secret. *Id.* Thus, while public revelation would dispel all secrecy, the owner of a secret need not remain totally silent. *Id.*

---

7. *See* footnote 1, *supra*.

¶ 24 Ehmke contends that Enterprise did not keep the documents secret. However, all Enterprise need show is that it made reasonable efforts to maintain the confidentiality of the disputed information, *see K–2 Ski Co.,* 506 F.2d at 474, and this it did. Not only did Enterprise make reasonable efforts to ensure the confidentiality of the information, such as limited disclosure to those employees in need of the information to perform their duties and general directives regarding confidentiality, but it specifically included a confidentiality provision in its employment agreement for high-level managers such as Ehmke, as well as in the employee policy handbook that all employees had to acknowledge and sign. These measures demonstrate adequate safeguards to protect the financial documents and the Worksheet.

¶ 25 Ehmke erroneously asserts that he merely tapped his general knowledge of the car-rental business to produce documents for Premier, and, indeed, trade-secret law does and should not prevent former employees from using their general knowledge and skill at another job. *Amex Dist. Co.,* 150 Ariz. at 516, 724 P.2d at 602. However, the policy supporting trade-secret law is to balance this public interest in competition in the workplace with the need for commercial ethics. *See Kewanee Oil Co.,* 416 U.S. at 481–82, 94 S.Ct. 1879; *see also PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1268 (7th Cir.1995); *Bryceland v. Northey,* 160 Ariz. 213, 216, 772 P.2d 36, 39 (App.1989). Accordingly, a business must be afforded protection against the wrongful appropriation of confidential information by an employee, not only to encourage innovation and invention, but also to establish fair business practices. *See Winston Research Corp. v. Minnesota Mining and Manuf. Co.,* 350 F.2d 134, 138 (9th Cir. 1965); *Amex Dist. Co.,* 150 Ariz. at 516, 724 P.2d at 602. The record does not support Ehmke's contention that his "workproduct" was only an exercise of the general knowledge of those in the business.

¶ 26 Clearly this case does not present a situation in which one innocently discovers a secret or in good faith paid value for the secret. *See* RESTATEMENT OF TORTS § 758 cmt. a. Enterprise took adequate practical steps to protect this information from public disclosure. Relying on its general protective procedures and, specifically, the nondisclosure provision of Ehmke's contract, Enterprise imparted this information to Ehmke for his use in the context of his employment with Enterprise. The contract obligated Ehmke to maintain the confidentiality of Enterprise's financial information and Worksheet; it did not exclude information that Ehmke as an Enterprise employee himself contributed. There is no question that Ehmke knew and understood this limited use. Ehmke had notice of the confidentiality of the information and used improper means to appropriate, disclose and utilize Enterprise's trade secrets in his own business endeavors.

## CONCLUSION

¶ 27 The judgment of the trial court is reversed. The case is remanded for further proceedings consistent with this opinion.

CONCURRING: PHILIP E. TOCI, Judge, and THOMAS C. KLEINSCHMIDT, Judge.