PRAIRIE ISLAND INDIAN COMMUNITY,
Respondent,

v.

MINNESOTA DEPARTMENT OF PUBLIC SAFETY, Respondent (C9–02–1012, C0–02–1013), Appellant (C7–02–1025), Defendant (C2–02–1028),

and

William J. Lawrence, Appellant (C9–02–1012, C0–02–1013), Respondent (C7–02–1025), Intervenor–Defendant (C2–02–1028),

and

Star Tribune, Amicus Curiae, and Mille Lacs Band of Ojibwe Indians, Respondent (C9–02–1012, C0–02–1013), Plaintiff, (C7–02–1025, C2–02–1028),

v.

STATE of Minnesota and Charlie Weaver as the Commissioner of the Minnesota Department of Public Safety, Respondents (C9–02–1012, C0–02–1013), Appellants (C7–02–1025, C2–02–1028),

and

William J. Lawrence, Appellant (C9–02–1012, C0–02–1013), Respondent (C7–02–1025), Intervenor–Defendant (C2–02–1028),

and

Star Tribune, Amicus Curiae.

Nos. C9–02–1012, C0–02–1013, C7–02–1025, C2–02–1028.

Court of Appeals of Minnesota.

April 1, 2003.

William J. Lawrence, St. Paul, MN, pro se appellant and intervenor.

John A. Knapp, Eric F. Swanson, Justice Ericson Lindell, Winthrop & Wein-

stine, P.A., St. Paul, MN, for respondent Prairie Island Indian Community.

Wallace G. Hilke, Lindquist & Vennum, P.A., Minneapolis, MN, for respondent Mille Lacs Band of Ojibwe Indians.

Mike Hatch, Attorney General, and John S. Garry, Assistant Attorney General, St. Paul, MN, for appellant Minnesota Department of Public Safety.

Considered and decided by MINGE, Presiding Judge, PETERSON, Judge, and HUDSON, Judge.

## OPINION

MINGE, Judge.

The state of Minnesota (State) and William Lawrence as an intervenor appeal from a summary judgment determination that the Minnesota Government Data Practices Act (MGDPA) does not require release of financial audit information submitted to the State by Prairie Island Indian Community and the Mille Lacs Band of Ojibwe Indians pursuant to tribal/state gaming compacts. The Prairie Island Indian Community and the Mille Lacs Band of Ojibwe Indians cross-appeal determinations by the district court that disclosure is not prohibited by federal law, contractual limits, or estoppel. Because we conclude that the release of at least some of the financial audit information is required under the MGDPA and that neither federal law, nor contractual limits, nor estoppel preclude disclosure, we affirm in part, reverse in part, and remand.

## FACTS

Respondents Prairie Island Indian Community (Prairie Island) and the Mille Lacs Band of Ojibwe Indians (Mille Lacs) are federally recognized Native American tribal governments. In 1988, Congress enacted the Indian Gaming Regulatory Act

(IGRA) that established a system for gaming on Indian land and required compacts between states and any tribes that engage in certain gaming activities. 25 U.S.C. §§ 2701, 2710(d) (1988). IGRA also established the National Indian Gaming Commission (NIGC) to provide federal oversight of Indian gaming. *Id.* §§ 2704, 2706.

In 1989 and 1990, respectively, Prairie Island and Mille Lacs entered into compacts with the State for Class III video games of chance. In 1991, Prairie Island and Mille Lacs entered into tribal/state compacts with the State regarding Class III blackjack. The compacts require the tribes to make certain casino financial audit information available to the State upon request. The blackjack compact provides that "[t]o the extent possible under state law, the State shall not disclose any information obtained pursuant to such a request." The video compact does not contain a similar limitation on disclosure by the State.

The Minnesota Department of Public Safety (DPS) has been responsible for overseeing the State's interest in Native American gaming operations. The DPS sought and obtained certified financial statements from Prairie Island for the years 1991–1997. The DPS sought and obtained similar financial statements from Mille Lacs for the years 1991–1995 for both its Hinckley and Mille Lacs casinos. All statements were prepared by independent accounting firms in accordance with generally accepted accounting standards. Availability of those financial statements to the public is the subject of this lawsuit.

The statements at issue cover the tribes' gaming activities in the aggregate and consist of summary, consolidated balance sheets, profit-and-loss statements, and cash-flow statements. Distributions to the respective communities and some detail regarding debt is set forth in the state-

ments. Aside from single line-item entries, the statements do not set forth any details regarding gaming, hospitality, or retail operations, nor do the statements differentiate among or provide information about different forms of gaming. The mix and scope of gaming and other operations has changed since the date of the last statement at issue in this proceeding.

When Prairie Island provided its financial information, it reaffirmed its understanding that the DPS would not disclose the information to the public. Prairie Island only provided its audits to the DPS and to the NIGC. Prairie Island has taken steps to maintain the confidentiality of the data internally by limiting the number of its members who have access to the data. In September 2001, Prairie Island passed a formal resolution that codified the practice of restricting internal access to the audits.

Prairie Island submitted affidavits from Tribal Council President Audrey Kohnen and Finance Director Frank J. Loth regarding the nature of the audit data. Kohnen and Loth averred that competitors could use the otherwise unavailable audit data to reduce costs in starting and maintaining casinos. Michael Opton, a gaming analyst for Nevada Gaming Publishing, averred that cumulative financial information, even if several years old, would provide significant benefit to competitors and suppliers.

During the years in question, Mille Lacs' casinos were managed by a publicly held company, Grand Casinos, Inc. Grand Casinos, Inc. filed annual reports with the Securities and Exchange Commissioner (SEC) and those reports are available to the public. The SEC filings contain different financial information than do Mille Lacs' audits, and the SEC filings use a fiscal year different from the fiscal year in the audits. In addition, the SEC filings contain information about other casinos managed by Grand Casinos, Inc.

Affidavits from the State indicate that significant information regarding casino and gaming activities is publicly available. Both Prairie Island and Mille Lacs submitted financial information to their association—Minnesota Indian Gaming Association (MIGA)—in 1992 and 1997 for use in MIGA's reports concerning the economic impact of Indian gaming in Minnesota. These MIGA reports list the aggregate average gross revenue, expense, and income information. The reports do not provide financial information with respect to any individual tribe. MIGA does not release specific audit or other financial information. Various newspapers have secured and published gaming financial data. Intervenor Lawrence has published this information on the White Earth Band in his newspaper. The White Earth Band voluntarily published its audit for the year 2000 and stated it will make its audits available in the future. Various trade publications report average net revenue per day for each of the various types of casino video-gaming machines and blackjack tables and other statistics regarding casino operations for different parts of Nevada and three other states. The State has made available to the public details of the state lottery, summary information on charitable pull-tabs, and gaming and financial information on the Canterbury Park racetrack.

Neither Prairie Island nor Mille Lacs sought out and reviewed the published or publicly available reports on other Minnesota gaming operations. This includes published reports on other Minnesota tribal gaming, and extensive publicly-available financial information regarding the Minnesota state lottery, the Canterbury Park racetrack, and charitable gambling.

In February 2001, appellant William Lawrence, the publisher of the Native American Press/Ojibwe News, asked the DPS for a copy of financial audit data submitted by the Red Lake Band of Chippewa Indians. The DPS denied the request, taking the position that the financial audit data are nonpublic. Lawrence then requested an advisory opinion from the Commissioner of the Minnesota Department of Administration (Commissioner) pursuant to Minn.Stat. § 13.37 (2002). On June 6, 2001, the Commissioner issued an opinion that the Red Lake audit data are public according to the Minnesota Government Data Practices Act (MGDPA). Based on the Commissioner's opinion, the DPS released the Red Lake data. Neither Prairie Island nor Mille Lacs has sought this information.

Thereafter, Lawrence requested financial audit information for Prairie Island and Mille Lacs. The DPS advised Prairie Island and Mille Lacs of the requests and that the DPS would release the information based on the Red Lake determination. In July 2001, the DPS asked the Commissioner to temporarily classify the tribal gaming audits as nonpublic data. On August 28, 2001, the Commissioner approved the request, classified the information as nonpublic data, and submitted its decision to the Minnesota Attorney General for review as required by Minn.Stat. § 13.06, subd. 5 (2002). The Attorney General rejected the classification of the audit data as nonpublic.

Prairie Island and Mille Lacs brought suit to preclude the DPS from disclosing the financial audit data to the public. Lawrence intervened. The parties stipulated to the issuance of a temporary injunction prohibiting such disclosure during the pendency of these actions. Prairie Island and Mille Lacs moved for summary judgment, arguing that: (1) federal law in this area preempts Minnesota law and precludes the State from releasing the audit data; (2) the tribes' characterization of the data as nonpublic controls; (3) the State's disclosure of the audit data would constitute a breach of contract; (4) the State is estopped from disclosing the audit data; and (5) the audit data are nonpublic tradesecret information under Minnesota law. The district court held that the audit data are nonpublic trade-secret information under Minnesota law and rejected the other arguments made by Prairie Island and Mille Lacs.

The State and Lawrence appeal the determination that the audit data are tradesecret information under Minnesota law. Prairie Island and Mille Lacs appeal the federal law, breach of contract, and estoppel determinations of the district court. We reverse the determination that the entire audit report is trade-secret information, affirm the other determinations, and remand.

## ISSUES

1. Do the federal classification of audit data as nonpublic and the federal regulatory framework preclude Minnesota from releasing financial statements of Native American casinos or preempt the Minnesota Government Data Practices Act (MGDPA) classification of such financial statements as public data?

2. Are financial statements trade secrets and therefore nonpublic data under MGDPA?

3. Did the district court correctly determine that the State's disclosure of financial statements of Native American casinos, pursuant to a request under the MGDPA, does not constitute a breach of contract?

4. Did the district court correctly determine that the State is not estopped

from disclosing financial statements of Native American casinos pursuant to a request under the MGDPA?

## ANALYSIS

Each of the four issues considered in this appeal presents an independent and adequate basis for precluding disclosure of the financial audit information. Because we reverse the decision of the district court, each is considered. The district court resolved all matters in its summary-judgment decision.

On an appeal from summary judgment, this court asks two questions: "(1) whether there are any genuine issues of material fact and (2) whether the lower court erred in its application of the law." *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn. 1990).

> A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted.

*Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citations omitted). Even though an appellate court may disagree with the trial court's analysis of some issues, summary judgment will be affirmed if it can be sustained on any grounds. *Myers v. Price,* 463 N.W.2d 773, 775 (Minn.App.1990), *review denied* (Minn. Feb. 4, 1991). When the district court grants summary judgment based on the application of a statute to undisputed facts, the result is a legal conclusion, reviewed de novo by the appellate court. *Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 856 (Minn.1998).

## I.

The law of Native American gaming is a complex maze of federal, state, and contract law. The sovereign status of the individual Native American communities, although limited, contributes to the complexity. The first issue we face is whether federal law, by incorporation into or by preemption of Minnesota state law, protects the financial statements from disclosure.

### A. Does the MGDPA adopt the federal classification?

■ Prairie Island and Mille Lacs argue that the audit data are classified as nonpublic data under federal law, that the State has incorporated federal classifications by reference, and that as such, the data are classified as nonpublic data under the MGDPA. The federal rule is that all information received by the National Indian Gaming Commission (NIGC) is confidential. *See* 25 U.S.C. § 2716(a) (1988). The MGDPA reference to federal law is as follows:

> All government data collected, created, received, maintained or disseminated by a state agency, political subdivision, or statewide system shall be public unless classified by statute, or temporary classification pursuant to section 13.06, or *federal* law, as nonpublic or protected nonpublic[.]

Minn.Stat. § 13.03, subd. 1 (2002) (emphasis added). Thus, the claim is made that under the MGDPA, if the audit data are classified by a federal law as nonpublic, the State may not disclose the data.

■ Federal courts have held that tribal gaming audits are considered nonpublic data under the Indian Gaming Regulatory Act (IGRA). *E.g., Shakopee Mdewakanton Sioux (Dakota) Cmty. v. Hatch,* No. CIV 01-1737, 2002 WL 1364113, *6

(D.Minn. June 20, 2002). The requirement that the NIGC preserve information as confidential is not a "federal law" as the term "federal law" is used in Minn.Stat. § 13.03, subd. 1. The types of federal law to which the MGDPA refers are federal statutes that classify data as nonpublic *when the data are in the possession of a state agency.* If the IGRA classifies the data at issue as nonpublic only when the data are in the possession of the NIGC, it is not the type of federal law that is within the meaning of Minn.Stat. § 13.03, subd. 1. This was the position recently taken by the federal court for the district of Minnesota. *Shakopee Mdewakanton,* 2002 WL 1364113, at *6 (holding that IGRA classification of data only applies to data in the possession of federal government).

The *Shakopee Mdewakanton* decision is persuasive if not dispositive. A contrary result would import an entire universe of federal statutory and regulatory determinations limiting what may be public or nonpublic into our state statutes when there is no reason to believe that the state legislature, Congress, or federal agencies had this expansive expectation regarding the reach of the "federal" reference. Here, the IGRA places restrictions on what the NIGC may do with information obtained pursuant to the IGRA. The IGRA does not place a blanket classification of nonpublic on the audit data. Nor has NIGC used its regulatory powers to establish such a nonpublic classification for state purposes. Therefore, the requirement in IGRA that the NIGC preserve information as confidential is not a "federal law" as the term is used in the MGDPA.

B. *If the MGDPA does not adopt the federal classification, is the MGDPA preempted by the IGRA?*

Prairie Island and Mille Lacs argue that even if the MGDPA does not adopt the federal classification of the audit data as confidential, the IGRA preempts the MGDPA. According to this argument, the MGDPA and the IGRA conflict with each other, and the doctrine of preemption applies so that the IGRA classification prevails over the MGDPA classification.

The United States Supreme Court has held that

[s]tate jurisdiction is preempted * * * if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.

*California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216, 107 S.Ct. 1083, 1092, 94 L.Ed.2d 244 (1987) (quoting *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 333–34, 103 S.Ct. 2378, 2385–86, 76 L.Ed.2d 611 (1983)). The federal court for the district of Minnesota recently held that the IGRA does not preempt application of the MGDPA. *Shakopee Mdewakanton,* 2002 WL 1364113. We likewise conclude that the IGRA does not preempt the MGDPA.

## II.

■ The district court granted summary judgment for Prairie Island and Mille Lacs, concluding that as a matter of law the audits, in their entirety, are trade-secret information. The state appeals this determination and in the alternative, argues that even if some audit data are trade-secret information, those data can be redacted and the balance of the documents should be released.

■ Citizens' access to the records and files of the State and its political subdivisions is governed by the MGDPA. Minn. Stat. Ch. 13 (2002). This law, together with statutes such as the Open Meeting Laws, Minn.Stat. Ch. 13D (2002), the campaign finance and public disclosure laws,

Minn.Stat. Ch.10A (2002), and public proceedings of the judiciary, are part of a fundamental commitment to making the operations of our public institutions open to the public. In recognition of this policy, the courts construe such laws in favor of public access. *See Demers v. City of Minneapolis*, 468 N.W.2d 71, 73 (Minn.1991).

At the same time, we recognize and value the right of privacy in our society. *See Lake v. Wal–Mart Stores, Inc.*, 582 N.W.2d 231 (1998). Inevitably, these rights of access and openness and of privacy and confidentiality clash. This case illustrates such a clash. Mille Lacs and Prairie Island claim they furnished certain private financial statements to the State pursuant to law and certain compacts with the State; Lawrence—as a citizen, newspaper publisher, and Native American—and the Minnesota Attorney General's Office claim the information is a part of the repository of documents on file with the State that is open to public inspection under the provisions of the MGDPA.

The particular provision of the MGDPA at issue is the exception to disclosure for trade-secret information which is defined by law as

> government data, including a formula, pattern, compilation, program, device, method, technique or process (1) that was supplied by the affected individual or organization, (2) that is the subject of efforts by the individual or organization that are reasonable under the circumstances to maintain its secrecy, and, (3) that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

Minn.Stat. § 13.37, subd. 1(b). The first two requirements are not at issue. The district court found and the parties agree:

(1) the disputed information was supplied by Prairie Island and Mille Lacs; and (2) the two communities have made reasonable efforts to maintain the secrecy of this information. The dispute is whether, under the third requirement of the statute, the data derive independent economic value from not being known or readily ascertainable by others who can profit from their use or disclosure.

Several court decisions have dealt with the trade-secret question. One from Minnesota is especially relevant. *See In re Rahr Malting Co.*, 632 N.W.2d 572 (Minn.2001). In *Rahr*, the issue was whether the tax court should be required to close portions of a property-valuation trial so that the following types of records would remain confidential: sales data, cost of grain, gross margin for malting, general and administrative expenses, dealings with a subsidiary, borrowing costs, working capital, overall profitability, selling price for malt, and quantity of product shipped to specific customers. *Id.* at 575. The *Rahr* opinion placed the burden of proof on the party claiming trade-secret status and required specificity in proving harm from disclosure. *Id.* at 576. The supreme court then rejected Rahr's trade-secret and damage claims as being conclusory and remanded the case for further in-camera proceedings. *Id.* at 576–77. Specifically, the court rejected as conclusory an affidavit from the company's chief executive officer that Rahr was one of only four malting companies, that Rahr had only two main customers, and that availability of the records in question to these competitors and customers would threaten Rahr's very viability. *Id.* at 574–75.

In addition, a decision from the state of Washington held that the gross-revenue figures of tribal casinos are not a trade secret under the laws of that state. *See Confederated Tribes of the Chehalis Reser-*

*vation v. Johnson,* 135 Wash.2d 734, 958 P.2d 260 (1998). In *Confederated Tribes,* the tribes asserted that the information had independent economic value from not being known and that if competitors in the gambling business had this information, they could gain an advantage by calculating the relevant gaming market and market competition. *Id.* at 267.

Other decisions commonly cited on the issue of whether basic financial statements like balance sheets, profit-and-loss statements, and cash-flow statements are trade secrets are not helpful. Most of the cases involve financial statements along with many other types of detailed information which clearly have a very proprietary nature. *See Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1117–18 (Fed.Cir. 1996); *R & D Bus. Sys. v. Xerox Corp.,* 152 F.R.D. 195, 196–98 (D.Colo.1993); *Centrol, Inc. v. Morrow,* 489 N.W.2d 890, 894–95 (S.D.1992); *see also* Roger M. Milgrim, *Milgrim on Trade Secrets,* Vol. I § 1.09(8) (2001). The difficulty with much of the case law analysis is illustrated by Milgrim's citation of a Minnesota case, *Menter Co. v. Brock,* 147 Minn. 407, 180 N.W. 553 (1920), for the proposition that the "method of accounting and records [are] not trade secret[s]." Milgrim, *supra,* § 1.09(8)(e). In fact, the *Brock* case involved use of an off-the-shelf accounting ledger book and the principles of making entries in the book. *Id.* at 408, 180 N.W. at 554. The court held that when a clothing-store manager left for a competing clothing store and purchased and used the same brand of ledger book in the other store, he had not compromised a trade secret. *Id.*

The real challenge in this case is to determine whether relatively short, summary, consolidated balance sheets, cash-flow statements, and profit-and-loss statements for significant gambling operations derive independent economic value from not being known to or ascertainable by others. In this case, Mille Lacs and Prairie Island filed several affidavits in an effort to show the independent economic value and lack of availability of the financial information at issue and thus avoid the problems *Rahr* and *Confederated Tribes* faced in trying to convince courts that financial statements should be treated as trade secrets. The affidavits in this case allege several types of value to others and value from maintaining the confidentiality of the statements. These include value to competitors who would gain insight into the health of the party's gambling business. This would allegedly enable competitors to break down and analyze intimate details of the business, to develop competitive marketing strategies, sales, promotions and public relations campaigns, and to know the details of the cost of products used, revenue from various operations, details of financing, and cost of personnel, all of which would give competitors an advantage.

Another type of value recited in the affidavits is that, armed with the financial information about the Prairie Island casino, prospective competitors could avoid the pitfalls a casino faces in starting up. Presumably, the audits would allow such competitors to focus on profitable strategies discoverable from the records of Prairie Island and Mille Lacs casinos without the cost of experimentation and losses they may otherwise encounter.

It is also represented that suppliers and personnel would better understand the profitability of the casino operations and because there are a limited number of suppliers, they would negotiate higher prices for the goods and services they supply. Finally, it is claimed that the information in the records is easily salable to competitors.

This court has had an opportunity to review the financial statements in question. Nothing in the statements breaks out or identifies the different types of food service, entertainment, hospitality, promotions, or gaming activity, let alone sets forth types of promotions or marketing strategies, wage rates, cost of any specific goods purchased, or fees for any category of consultant. One would have to have detailed additional financial information regarding historical operations to tease out the possible valuable uses recited in the respondents' affidavits. Although there are some details about financing operations, they are historic and do not disclose information that is not common knowledge to borrowers in our society. In short, although the affidavits identify problems with disclosure, they appear targeted at disclosures that would be much more revealing than the audit statements at issue here.

There are five additional considerations that are relevant to whether disclosure of the audit records in question would conflict with the trade-secret exception in MGDPA. First, if data are readily ascertainable by proper means, those data cannot derive independent economic value from nondisclosure. Minn.Stat. § 13.37, subd. 1(b). Here, significant portions of the Mille Lacs' audit data were supplied by Grand Casinos, Inc. in its SEC filings, which are publicly available. In addition, the district court found that the *Minneapolis Star Tribune* and the *St. Paul Pioneer Press* published articles between 1992 and 1995 that contained information about gross revenues and net profits at the Mille Lacs and Hinckley casinos. Because the information in the SEC filings used different accounting periods, included information about casino operations in addition to those conducted by Mille Lacs, and did not have the detail contained in the financial statements in this case, the district court

concluded the SEC filings did not so compromise the data in the financial statements as to affect the trade-secret claim. However, much of the damage feared by Mille Lacs comes from having the SEC financial information, consistently complied and for multiple years, in the public domain at all. Suppliers, personnel, and established competitors have access to much of the information. Thus, it is difficult to say that an important part of the Mille Lacs information is not readily ascertainable by proper means from other sources. Because there has been no SEC source of information on Prairie Island, its position is not affected by this consideration.

Another dimension of ascertainability of information is the public nature of casino operations. The State argues that visits to casino premises will disclose the number of black jack tables, slot machines, and customer response. At least one *Star Tribune* article set forth this information as well as number of employees, wages, and customers per day. Armed with such information, suppliers can compare casinos and identify those which appear more profitable. Although financial statements are more specific and add to such impressionistic information, the level of confidentiality in operations that would keep competitors at bay or avoid giving an advantage to suppliers is hard to achieve. This affects the claimed value of classifying financial statements as trade secrets.

Second, the affidavits submitted by Prairie Island and Mille Lacs are thin; they summarize objections to the release of information. The State provided affidavits with exhibits and raised a series of objections to the Prairie Island affidavits. It is noteworthy that the Prairie Island affidavits do not disagree that a substantial quantity of information is available from trade publications or publicly available financial statements from publicly traded

corporations in the gaming business. The State's affidavits include examples of such detailed information. Neither Mille Lacs nor Prairie Island addresses the State's assertion that competitors and suppliers need only visit the casino premises to assess retail prices, nature of operations, and level of business activity. Advertising strategies are available by watching the media. The financial statements at issue here are skeletal. The claimed value of this information to competitors is apparently limited as evidenced by the State's assertion that neither Prairie Island nor Mille Lacs has sought the financial data of the Red Lake Casino. Unlike the *Rahr* case where there was great detail about product and pricing and a very small, private marketplace, here we have public businesses, tens of thousands of customers, and an open marketplace. Given the abbreviated and consolidated nature of the financial statements in this case, these statements are substantially less compromising than the detailed data the tribes' affidavits describe.

In granting summary judgment, the district court should have assumed the availability of information contained in the affidavits from the State. *See Grondahl v. Bulluck*, 318 N.W.2d 240 (Minn.1982) (noting that, on summary judgment motion, district court must view the evidence in the light most favorable to the nonmoving party). Rather, the district court overstates the information in the financial statements at issue and the probability of the respondents' affidavits and disregards the significance and availability of information from other sources.

Third, the financial records are dated. Courts have recognized that financial-statement-type data lose their significance over time. *See Applied Indus. Materials Corp. v. Brantjes*, 891 F.Supp. 432, 438–39 (N.D.Ill.1994) (net-profit figures three or more years old not protected as trade secret); *In re Agent Orange Product Liability Litigation*, 104 F.R.D. 559, 575 (E.D.N.Y.1985) (important factor in determining whether disclosure will cause competitive harm is whether the information that the party seeks to protect is current or stale), *aff'd*, 821 F.2d 139 (2d Cir.1987); *United States v. IBM Corp.*, 67 F.R.D. 40, 47–49 (S.D.N.Y.1975) (finding trade-secret financial data, including gross profits, three to fifteen years old not protected as trade secret). However, some courts have pointed out that highly detailed information that includes specific pricing and customer-service strategy had value from nondisclosure for an indefinite period of time. *See Enter. Leasing Co. v. Ehmke*, 197 Ariz. 144, 3 P.3d 1064, 1069–70 (Ct. App.1999). Prairie Island's affidavits claim that the older balance sheets, cash flows, and profit-and-loss statements could help a competitor avoid mistakes and costs in starting up competing casinos. But older statements in a consumer-oriented business are of little significance compared to a visit to the premises to see what appeals to customers. To be sure, competitors or suppliers may be curious about financial performance more than six years ago. The harmful consequences alleged are conjectural and conclusory and are inherent in summary financial statements of consumer businesses. The primary interest in the statements appears to come from the news media, not competitors.

Fourth, a different part of the MGDPA sheds light on the classification of certain financial statements. When a business requests financial assistance from a governmental entity, financial data is typically submitted as a part of the loan or grant request. The MGDPA gives certain financial documents complete nonpublic status and others temporary nonpublic status, which is withdrawn if the assistance is granted. Minn.Stat. § 13.591, subds. 1, 2.

Balance sheets and net-worth calculations lose protected status; business plans, customer lists, and tax returns keep the protected status; and income-and-expense projections unrelated to the assistance keep the protection. *Id.* It appears that the legislature concluded that a business with a public financial dimension gives up protected, private treatment for its basic, core financial statements, but retains it for its detailed and unique private data and for its future plans. Although we do not have any parallel legislative distinctions in connection with trade secrets generally, or gaming reports in particular, this distinction in the MGDPA is of interest. It is legislative recognition that basic financial statements like the ones involved in this case may not qualify for special protection.

■ Finally, there is a question whether the financial statements should be considered in their entirety or whether any actual trade-secret information can be redacted. When a document contains both public and nonpublic information, it is appropriate to redact the protected information and release the public information. *Northwest Publ'ns, Inc. v. City of Bloomington*, 499 N.W.2d 509, 511 (Minn.App. 1993). When a document contains both public and nonpublic information, the entire document may only be withheld if

> the public and nonpublic information is so inextricably intertwined that segregating the material would impose a significant financial burden and leave the remaining parts of the document with little informational value.

*Id.*

The State edited the statements to indicate what could be redacted to meet the trade secret objections raised by Prairie Island and Mille Lacs. Prairie Island and Mille Lacs claimed that it would be impossible to edit the statements and that only a singularly uninformative shell would be left. The district court rejected redacting. In looking at the statements and the state's proposal, it appears that redacting sensitive material is realistic; information is not inextricably intertwined, nor is the task burdensome. Line-item figures, parts of the text, and all or parts of certain footnotes can be easily omitted if they actually disclose trade secrets. Any value to competitors or suppliers from seeing the financial statements identified in the affidavits would be neutralized. The deletion of such information would be a simple task.

We conclude that to the extent there is any sensitive trade-secret information, the statements in question can be appropriately redacted. Because neither the district court nor Prairie Island nor Mille Lacs believed material could be successfully redacted, because we have no record as to whether any of the financial information is specifically sensitive and should not be disclosed, and because this is an appeal from summary judgment, we remand for consideration of what, if any, specific data constitute trade secrets and for redaction of that data. On remand, the district court may redact material that qualifies as trade secret or require the Departments of Public Safety and Administration to redact such material. Each party can provide a redacted document. Although this limits the informational value of the documents, it provides public access to basic information.

### III.

■ Next we address whether the district court erred by determining that disclosure of the audit data by the State is not a breach of the blackjack compact. That compact provides that "to the [e]xtent possible under state law the State shall not disclose any information obtained [pursuant to a request for Tribal audit data]." Furthermore, with each filing of its financial statements, Prairie Island's

cover statement recited its understanding that the Department of Public Safety (DPS) would not disclose the information to the public.

▮ Mille Lacs claims that when the State in this dispute argues that state law allows for disclosure of the audit data, the State breaches the covenant of good faith and fair dealing that is implied in every contract. The covenant of good faith and fair dealing prohibits a party from "unjustifiably hinder[ing]" the other party's performance of the contract. *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.1995) (citations omitted). "Actions are done in 'good faith when done honestly, whether it be negligently or not.'" *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn.App.1998) (quoting Minn.Stat. § 520.01, subd. 6 (1996)). On the other hand, actions are done in bad faith when "a party's refusal to fulfill some duty or contractual obligation [is] based on an ulterior motive, not an honest mistake regarding one's rights or duties." *Id.* (citing *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 837 (Minn.App.1994), *review denied* (Minn. June 29, 1994)).

Here, even if the State was negligent in forming its original belief that the audits are nonpublic, as long as the State's action was done honestly, the State has not breached the covenant of good faith and fair dealing. There is no evidence in the record to show that the State's conduct is based on an ulterior motive. Thus we conclude that the State did not breach the covenant of good faith and fair dealing.

Prairie Island argues that the district court erred by not considering that the intent of the parties, including the intent of the State, was for the audit data to remain nonpublic. Prairie Island argues that the blackjack compact is ambiguous and that

the district court therefore should have determined the parties' intended meaning.

▮ If the language of a writing is not ambiguous, the court does not examine extrinsic evidence to ascertain the intentions of the parties. *See Mareck v. Hoffman*, 257 Minn. 222, 227, 100 N.W.2d 758, 762 (1960) (noting *"[I]f* the language is ambiguous, resort may be had to evidence of the surrounding circumstances, and the situation of the parties, if necessary, in order to throw light upon their intention." (emphasis added) (quotation omitted)). "A writing is ambiguous if, judged by its language alone and without resort to extrinsic evidence, it is reasonably susceptible to more than one meaning." *Mollico v. Mollico*, 628 N.W.2d 637, 641 (Minn.App.2001) (citation omitted).

The language in the compact is as follows: "to the [e]xtent possible under state law the State shall not disclose any information obtained [pursuant to a request for Tribal audit data]." The language is not ambiguous, and the district court was correct in not resorting to extrinsic evidence to determine the intent of the parties.

Not only did the State never commit to maintain the confidentiality of the information regardless of any other requirements of law such as the MGDPA, but there is another level at which the good faith and fair dealing of the State is apparent in this controversy. The agency responsible for working with the Native American communities with gaming operations is DPS. DPS consistently has resisted efforts by the news media and parties like Lawrence to obtain the information. Not until overruled by the Commissioner of Administration did DPS release the Red Lake information. Then, to accommodate Mille Lacs and Prairie Island, the Commissioner temporarily classified the audits as nonpublic until this controversy could be settled. The Attorney General overruled that de-

termination but then reinstated the temporary nonpublic classification for the duration of litigation. On these facts, bad faith is not shown.

## IV.

The final issue we consider is the claim of Prairie Island that the State should be estopped from disclosing the audit data because the of the State's "consistent representation" that the audit data would be treated as nonpublic data.

Estoppel is an equitable doctrine "addressed to the trial court's discretion, and which is not freely applied against the government." *In re REM–CANBY, Inc. v. Dep't of Human Servs.*, 494 N.W.2d 71, 74 (Minn.App.1992) (citation omitted), *review denied* (Minn. Feb. 25, 1993). The elements of estoppel are: (1) the government made a misrepresentation of material fact; (2) the government knew the representation was false; (3) the government intended that its representation be acted upon; (4) the other party did not know the facts; and (5) the other party relied upon the government's misrepresentation to its detriment. *Id.* But "[t]he most important element of an equitable estoppel case against the government is wrongful government conduct." *State v. Ramirez*, 597 N.W.2d 575, 578 (Minn.App. 1999) (citing *Ridgewood Dev. Co. v. State*, 294 N.W.2d 288, 293 (Minn.1980)). Wrongful government conduct has been interpreted to mean "affirmative misconduct." *Id.* Wrongful government conduct is not present where the government's conduct is "simple inadvertence, mistake, or imperfect conduct." *In re REM–CANBY*, 494 N.W.2d at 74 (citing *Mesaba Aviation Div. v. County of Itasca*, 258 N.W.2d 877, 880–81 (Minn.1977)); *In re Westling Mfg., Inc.*, 442 N.W.2d 328, 332 (Minn.App. 1989), *review denied* (Minn. Aug. 25, 1989).

Here, there has been no showing of affirmative misconduct by the government. The State may have been mistaken in its representations, but there is no evidence to show that the State's conduct was affirmative misconduct. Accordingly, the State is not estopped from arguing that the data are public data.

## DECISION

Because we conclude that most of the audit data do not derive independent economic value from nondisclosure, we reverse the determination that the financial statements are nonpublic data trade secrets. We remand for a determination of what, if any, audit data should be redacted. We affirm the district court's other determinations.

**Affirmed in part, reversed in part, and remanded.**