302 P.3d 628

**Michael CALISI, Plaintiff/
Counterdefendant/Appellant/Cross–
Appellee,**

**v.**

**UNIFIED FINANCIAL SERVICES, LLC, an Arizona corporation; Unified Wealth Management, an Arizona corporation, Defendants/Counterclaimants/Appellees/Cross–Appellants.**

**No. 1 CA–CV 11–0812.**

Court of Appeals of Arizona, Division 1, Department B.

April 11, 2013.

Ariz. at 556 ¶ 4, 136 P.3d at 875. That is not so        here.

Jaburg & Wilk, P.C. by Kraig J. Marton and David N. Farren, Phoenix, Attorneys for Plaintiff/Counterdefendant/Appellant/Cross-Appellee.

Snell & Wilmer L.L.P. by Brian J. Foster and Martha E. Gibbs and Anthony T. King, Phoenix, Attorneys for Defendants/Counter-claimants/Appellees/Cross–Appellants.

## OPINION

NORRIS, Judge.

¶ 1 This appeal and cross-appeal arise out of claims for unpaid wages and misappropriation of trade secrets between Plaintiff/Appellant Michael Calisi and Defendants/Appellees Unified Financial Services ("UFS") and Unified Wealth Management ("UWM"). The superior court granted Calisi's claim for unpaid wages and UFS's counterclaim for misappropriation of trade secrets, leaving a net judgment in UFS's favor.

¶ 2 On appeal, Calisi argues, among other matters, that UFS failed to present evidence supporting its claim it had an enforceable trade secret in its customer lists. In its cross-appeal, UFS argues the superior court should not have trebled the amount of unpaid wages because a good faith dispute existed between the parties. As discussed below, we agree with Calisi that UFS failed to prove its customer lists constituted a trade secret, and disagree with UFS that it withheld Calisi's unpaid wages in good faith.

## FACTS AND PROCEDURAL BACKGROUND

¶ 3 In January 2006, Calisi, a certified public accountant ("CPA"), started working as an accountant at UFS, a firm that prepares tax returns and provides financial planning services. As UFS's only CPA, Calisi focused primarily on corporate accounting, although he sometimes prepared tax returns for individual clients and hoped to develop a practice in financial planning. In January 2007, UFS promoted Calisi to vice president of operations at a salary of $75,000 per year.

¶ 4 Richard Boehm, UFS's president, became dissatisfied with Calisi's performance as vice president. In January 2008, Emily Britton began to share Calisi's vice president duties. In August 2008, Britton replaced Calisi as vice president, and Calisi became a non-salaried commission-only financial advisor. Meanwhile, to "soften the blow" of the demotion, Boehm and Britton asked Calisi to serve as the "tax season coordinator." They gave Calisi a list of tasks for the position and advised him he would be paid $15,000. The parties agreed UFS would pay the $15,000 in the form of contributions to Calisi's 401(K) account for 2008 and 2009. Accordingly, in December 2008, UFS contributed $3,185.15 to fund the balance of Calisi's 2008 401(K).

¶ 5 As tax season coordinator, Calisi was required to organize the annual tax season kickoff event, a program designed to familiarize UFS's financial advisors with the latest financial products and changes in the tax laws. As part of this event, Calisi was responsible for obtaining sponsors willing to pay for the opportunity to speak to the advisors. The event took place on January 8 and 9, 2009. An attendee testified the event was helpful to him as a financial advisor, and Boehm admitted raising sponsorship money from this event was important for UFS's tax season advertising.

¶ 6 Meanwhile, UFS was planning to associate with a new broker-dealer. Calisi, however, was unwilling to sign the documents that would allow him to work for the new broker-dealer. On January 26, 2009, Britton sent Calisi an e-mail, expressing her dissatisfaction with Calisi's refusal to sign the documents as presented. Although at trial the parties disputed whether UFS discharged Calisi or Calisi "self-eliminate[d]" his job, the parties agreed Calisi's employment with UFS ended on January 28, 2009.

¶ 7 Calisi then sought help from Daryle Messina, owner of a mortgage company that from 2004 to 2008 had maintained a mutual referral arrangement with UFS. Messina testified that on February 2, 2009, he sent out a mass e-mail to his company's database of "over 2,000" clients, some of whom were also clients of UFS. The e-mail announced Calisi had joined Messina's firm as its new in-house CPA and offered a discount on tax preparation services.

¶ 8 On the same day, Britton called Calisi and left him a voice message:

> Michael, this is Emily. I received a disturbing e-mail today from several clients who are not your clients, they are clients of other UFS Advisors that you are soliciting them via e-mail for a 10% discount on their tax return. This is not in accordance with the amicable letter of separation that we discussed. You are welcome to contact your personal clients and let them know you're leaving, but it is inappropriate for you to contact other UFS Advisors' clients and I expect you to stop doing so immediately. If you have any questions you may contact me. Thank you.

Sometime later, Calisi started his own firm and began to provide personal and business tax services.

¶ 9 Subsequently, Calisi sued UFS for $1,581.84 in unpaid commissions and $11,814.85 in unpaid compensation for the tax season coordinator work, alleging he had become entitled to the full amount of the $15,000 because he had completed the tax season kickoff event. He also sought damages under Arizona Revised Statute ("A.R.S.") section 23–355(A) (2012), a statute that permits an award of treble damages for unpaid wages. UFS counterclaimed and alleged various claims against Calisi, including a misappropriation of trade secrets claim.

¶ 10 Before trial, the superior court ordered Calisi to produce a list of UFS clients who had "moved their business from [UFS] to [Calisi's firm]" ("Calisi list"). The Calisi list identified 48 individuals and entities and showed Calisi had received approximately $50,000 in gross revenue from these clients in 2009 and 2010. At trial, Calisi testified that during his tenure at UFS, he had directly worked with several of the listed individuals and entities.

¶ 11 After a three-day bench trial, the superior court found UFS had improperly withheld Calisi's commissions and the balance of the $15,000 as tax season coordinator, and awarded him $43,760.40 in treble damages. The court rejected all of UFS's coun-

terclaims with the exception of the trade secret claim, finding Calisi had misappropriated UFS's "customer lists and personal information." The court awarded UFS $51,566.54 on the trade secret claim, and after offsetting the damages awarded to Calisi, entered a net judgment in UFS's favor and against Calisi for $7,806.14 plus interest. The court denied the parties' requests for attorneys' fees and costs.

## DISCUSSION

*I. Trade Secret Claim*

■ ¶ 12 On appeal, Calisi argues UFS failed to present any evidence he had misappropriated a legally enforceable trade secret, specifically, any customer list. In response, UFS argues it presented ample evidence that its customer lists contained confidential customer information entitled to protection as a trade secret.

■ ¶ 13 Whether a trade secret exists is a mixed question of law and fact. While we accept the superior court's findings of fact unless they are clearly erroneous, we review questions of law de novo. *Enterprise Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 148, ¶ 11, 3 P.3d 1064, 1068 (App.1999). "Thus, we are not constrained by the legal conclusions from facts found or inferred in the judgment of the [superior] court nor by its findings ... in questions of law or mixed questions of law and fact." *Id.* As discussed in detail below, we agree with Calisi that UFS failed to present any evidence its customer list constituted a trade secret.

■ ¶ 14 To establish a claim for misappropriation of a trade secret, the claimant must first prove a legally protectable trade secret exists. Arizona has adopted the Uniform Trade Secrets Act ("UTSA"), which codifies the basic principles of common law trade secret protection. *Id.* at 148, ¶ 12, 3 P.3d at 1068. Under the UTSA, a "trade secret" is

information, including a formula, pattern, compilation, program, device, method, technique or process, that both:

(a) Derives independent economic value, actual or potential, from not being gen-

erally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44–401(4) (2003). In interpreting the UTSA, we are entitled to rely on common law principles in the absence of a conflict. A.R.S. § 44–407 (2003) (UTSA displaces "conflicting tort, restitutionary and other laws ... providing civil remedies for misappropriation of trade secrets"); *accord Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 971 P.2d 936, 945 (1999).

■ ¶ 15 Because the hallmark of a trade secret is secrecy, the two-part inquiry under the UTSA focuses on: first, whether the subject matter of the information is secret; and second, whether reasonable efforts have been taken to keep the information secret. A.R.S. § 44–401(4); *Enterprise Leasing Co.*, 197 Ariz. at 149, ¶ 15, 150, ¶ 22, 3 P.3d at 1069, 1070. In the context of customer lists, trade secret protection does not depend on whether the "list" misappropriated is in written form or memorized. *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St.3d 58, 881 N.E.2d 850, 853–54, ¶ 19 (2008); *Ed Nowogroski Ins., Inc.*, 971 P.2d at 948. Rather, courts have identified several factors to determine whether a customer list qualifies as a trade secret.

■ ¶ 16 A customer list may be entitled to trade secret protection when it represents a selective accumulation of detailed, valuable information about customers—such as their particular needs, preferences, or characteristics—that naturally "would not occur to persons in the trade or business." *Enterprise Leasing Co.*, 197 Ariz. at 149, ¶¶ 15–16, 3 P.3d at 1069 (matters of public knowledge are not trade secrets; subject matter of trade secret must be sufficiently novel, unique, or original that it is not readily ascertainable to competitors); *Prudential Ins. Co. of Am. v. Pochiro*, 153 Ariz. 368, 371, 736 P.2d 1180, 1183 (App.1987) (under common law, specific policyholder information, including amount of outstanding loans and dividends accrued, was trade secret); *Wright v.*

*Palmer,* 11 Ariz.App. 292, 296, 464 P.2d 363, 367 (1970) (under common law, general knowledge of business and customers acquired during employment is not trade secret); *accord Allen v. Johar, Inc.,* 308 Ark. 45, 823 S.W.2d 824, 827 (1992) (customer list containing detailed information about customers' "personality traits, hobbies and likes, credit history, buying habits and pricing agreements" was trade secret); *Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731, 735 (1997) (customer list containing "pricing information and knowledge about particular roofs and roofing needs of customers" was trade secret); *Steve Silveus Ins., Inc. v. Goshert,* 873 N.E.2d 165, 179 (Ind.Ct. App.2007) (customer list containing client names, "farm description, past insurance coverage, and loss histories" was trade secret); *Brown v. Rollet Bros. Trucking Co., Inc.,* 291 S.W.3d 766, 777 (Mo.Ct.App.2009) (to be protected as trade secret, customer list must be "more than a listing of firms or individuals which could be compiled from directories or other generally available sources") (citation omitted).

▆ ¶ 17 A customer list may also be entitled to trade secret protection if the claimant demonstrates it compiled the list by expending substantial efforts to identify and cultivate its customer base such that it would be difficult for a competitor to acquire or duplicate the same information. *Prudential Ins. Co.,* 153 Ariz. at 371, 736 P.2d at 1183 (under common law, list of customers, "if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, ... is in the nature of a trade secret") (citation omitted); *accord Morlife,* 66 Cal.Rptr.2d at 736 ("As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret."); *Am. Credit Indem. Co. v. Sacks,* 213 Cal. App.3d 622, 262 Cal.Rptr. 92, 93 (1989) (customer list was trade secret when employer winnowed potential customers down to the "elite" 6.5%); *Am. Paper & Packaging Products, Inc. v. Kirgan,* 183 Cal.App.3d 1318, 228 Cal.Rptr. 713, 717 (1986) (customer list was not trade secret when compilation process was "neither sophisticated nor difficult nor particularly time consuming," market was highly competitive, and customers did not have exclusive business relationships); *Stampede Tool Warehouse, Inc. v. May,* 272 Ill. App.3d 580, 209 Ill.Dec. 281, 651 N.E.2d 209, 216 (App.1995) ("customer list has been developed through the laborious method of prospecting, which requires a substantial amount of time, effort, and expense").

▆ ¶ 18 A related factor is whether the information contained in the customer list derives independent economic value from its secrecy, and gives the holder of the list a demonstrable competitive advantage over others in the industry. *Enterprise Leasing Co.,* 197 Ariz. at 148, ¶ 14, 150, ¶ 20, 3 P.3d at 1068, 1070; *Amex Distrib. Co., Inc. v. Mascari,* 150 Ariz. 510, 517, 724 P.2d 596, 603 (App.1986) (under common law, customer list was not trade secret when customers were known and generally accessible to competitors); *accord Delta Med. Sys. v. Mid–Am. Med. Sys., Inc.,* 331 Ill.App.3d 777, 265 Ill. Dec. 397, 772 N.E.2d 768, 781 (App.2002) (customer list generated during litigation was not trade secret because it was not a list maintained during employer's course of business and only contained names); *Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.,* 725 So.2d 902, 910 (Miss.1998) (customer list was trade secret when it had independent economic value as evidenced by fact marketing companies were willing to pay money for it).

¶ 19 In addition, courts have considered the extent to which the claimant divulged its customer list externally and internally, i.e., to people outside of its business as well as to its own employees. *Miller v. Hehlen,* 209 Ariz. 462, 470–71, ¶ 28, 104 P.3d 193, 201–02 (App. 2005) (customer list was not trade secret when employer gave it to former employee and did not condition its use); *Enterprise Leasing Co.,* 197 Ariz. at 150, ¶¶ 22–23, 3 P.3d at 1070 (while employer does not relinquish trade secret by disclosure to employees on a necessary basis or by limited publication for a restricted purpose, business that takes only scant precautions in safeguarding trade secret will not receive protection); *accord*

*Allied Supply Co., Inc. v. Brown,* 585 So.2d 33, 36 (Ala.1991) (customer and vendor lists were not trade secrets because multiple copies existed and employees had free access); *Courtesy Temp. Serv., Inc. v. Camacho,* 222 Cal.App.3d 1278, 272 Cal.Rptr. 352, 358 (1990) (customer list was trade secret when it was not divulged to outsiders, and employees were allowed access only on an "as needed basis" to perform their duties); *Saturn Sys., Inc. v. Militare,* 252 P.3d 516, 522 (Colo.Ct. App.2011) (database of client information was trade secret when information was confidential and not known to outsiders, and access was strictly limited on a "need to know" basis within company).

¶ 20 Here, the superior court found UFS's "customer lists and personal information" constituted a trade secret. While we normally defer to a trial court's factual findings, we cannot do so here because this finding is unsupported by the evidence. *See supra* ¶ 13.

¶ 21 At trial UFS did not present evidence actually describing the confidential customer information it argued constituted a trade secret. Although Boehm and Britton testified UFS attempted to cross-sell financial products to its tax clients by using information gleaned from their tax returns, UFS failed to present any evidence it had actually acquired any specialized, valuable information about its customers, such as information concerning their financial requirements, tax strategies, investment objectives, and risk and investment preferences that could constitute a protectable trade secret. Although UFS argues on appeal it "knows the nature" of the professional services required by the individuals identified in the Calisi list, it failed to present any evidence at trial that in providing services to these individuals, it actually developed, compiled, or captured any information regarding these individuals and their particular needs, preferences, strategies, or characteristics worthy of trade secret protection.

¶ 22 Further, UFS failed to show it had made substantial efforts to develop its customers and their personal information (assuming it had any such information), and this information would be difficult for a competitor to duplicate or acquire. Although Boehm

testified in passing UFS used direct mail advertising to obtain clients, generated reports to help cross-sell financial products to tax clients, and offered clients who "didn't come back" incentives in the hope it would recapture lost business, neither he nor any other witness provided any details on how UFS acquired and retained its clients vis-á-vis its competitors. The record is completely silent regarding the cost, time, frequency, and success rate of UFS's direct mail advertising or its use of any other marketing method, such as "cold calling," tax seminars, or financial planning programs. Simply put, UFS failed to present any evidence that it had expended substantial effort to develop its customers and any personal information about them in a way that its competitors could not duplicate.

¶ 23 Because UFS did not explain what unique and original information it had acquired in the course of its business, or show it had invested substantial time and effort to acquire information unknown to its competitors, it failed to meet its burden of proving its customer lists were a trade secret. As we explained in *Enterprise Leasing Co.,* not every commercial secret will be a trade secret; only those secrets "affording a demonstrable competitive advantage" will qualify. 197 Ariz. at 150, ¶ 20, 3 P.3d at 1070.

¶ 24 UFS also failed to demonstrate it had actually treated its customer lists as a secret. Although secrecy does not need to be absolute, the claimant must nevertheless show "it made reasonable efforts to maintain the secrecy of the information such as to ensure that it would be difficult for others to discover the information without using improper means." *Id.* at ¶ 23. Yet, Messina knew the identity of several UFS clients. Specifically, he testified his mortgage firm and UFS had shared a mutual referral arrangement for years, thus resulting in an overlap in clientele, and he had included these overlapping clients in the mass e-mail he sent out announcing Calisi's association with his firm. *See supra* ¶ 7. And, Calisi testified Messina had "flagged" customers in his database who were also UFS clients. Thus, Calisi could have readily and, without using "improper

means," independently ascertained UFS clients through Messina. *Enterprise Leasing Co.*, 197 Ariz. at 150, ¶ 23, 3 P.3d at 1070.

¶ 25 In addition, after he left UFS, Britton told Calisi he could contact his "personal clients," but not clients of other UFS advisors. *See supra* at ¶ 8. Although at trial Britton explained she meant Calisi could continue to work with "CPA clients," but not the "financial planning and tax" clients, nevertheless, UFS's initial willingness to allow Calisi to contact his UFS clients without any limitation undercuts its argument that it treated the identity of its customers as a secret.

¶ 26 While UFS argues it took steps to "safeguard the confidentiality" of its client information—it incorporated confidentiality clauses in employment agreements, upgraded its electronic security system, terminated former employees' access rights, and complied with financial regulations regarding protection of clients' personal identification information—without a trade secret in substance, those protective measures could not by themselves create any trade secret. A.R.S. § 44–401(4). Although there may be substantial overlap between confidential information and trade secrets, they are not synonymous. *Enterprise Leasing Co.*, 197 Ariz. at 150, ¶ 20, 3 P.3d at 1070; *accord Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex.Ct.App.2004) (trade secret status does not automatically attach to information company acquires regarding its customers; "secrecy is not limited solely to confidentiality, but also requires that the information is not generally known or readily ascertainable by independent investigation") (citation omitted); *MP Med. Inc. v. Wegman*, 151 Wash. App. 409, 213 P.3d 931, 939 (2009) (confidentiality agreements alone do not create trade secrets).

¶ 27 Because UFS failed to present evidence showing it had a legally enforceable trade secret, we vacate the superior court's judgment in UFS's favor on its trade secret claim. On remand, we direct the superior court to enter judgment in Calisi's favor on that claim.

## II. Treble Damages

¶ 28 In its cross-appeal, UFS argues the superior court should not have awarded Calisi treble damages because a good faith dispute existed as to, first, whether he had substantially performed the tasks as tax season coordinator, and second, the amount of set-off it was entitled to on its counterclaims. A.R.S. § 23–352(3) (2012) (employer can withhold wages if "reasonable good faith dispute" exists "as to the amount of wages due, including the amount of any counterclaim or any claim of debt, reimbursement, recoupment or set-off asserted by the employer against the employee"). Because, as discussed below, reasonable evidence supported the superior court's factual findings to the contrary, it did not abuse its discretion in awarding Calisi treble damages under A.R.S. § 23–355(A). *Apache E., Inc. v. Wiegand*, 119 Ariz. 308, 313, 580 P.2d 769, 774 (App. 1978) (appellate court reviews for abuse of discretion superior court's application of treble damages provision).

¶ 29 First, UFS did not dispute Calisi had earned the unpaid commissions. UFS's Chief Compliance Officer noted on an invoice dated January 8, 2009 the "Total Due to Michael [was] $1,581.84." We have held "failure to tender an unrestricted payment of wages that an employer has reasonably calculated it owes its employee, constitutes bad faith and exposes an employer to the possibility of treble damages." *Sanborn v. Brooker & Wake Prop. Mgmt., Inc.*, 178 Ariz. 425, 429, 874 P.2d 982, 986 (App.1994). Based on this evidence, UFS did not withhold the undisputed amount of Calisi's commissions in good faith.

¶ 30 Second, although at trial, UFS argued it was entitled to withhold the balance of the $15,000 because Calisi had not completed all of the assigned tax coordinator tasks, *see supra* ¶ 4, the superior court rejected this argument. In so doing, it implicitly credited Calisi's testimony he had "done substantially" the tax season coordinator work, the unfinished tasks were "de minimis," and Britton had assured him: "You will be paid your stipend for the tax season coordinator." Accordingly, based on the evidence presented, UFS unreasonably withheld Calisi's compen-

sation as tax season coordinator. *Sanborn*, 178 Ariz. at 428, 874 P.2d at 985 (when employee had absolute right to payment, employer was not justified in withholding wages merely because it considered employee's demands "excessive" and "overreaching").

### III. Judgment Against UWM

¶ 31 Although the superior court found no evidence supported liability of UWM, the parties stipulated in their joint pretrial statement that Calisi was an employee of both UFS and UWM, and "Unified Wealth Management LLC" had issued the invoice showing the amount of commissions owed to Calisi. Further, at trial, Calisi testified that when UFS advisors provided client asset management services, they were paid by UWM; thus, UWM was obligated to pay him the $1,581.84 unpaid commission, while UFS owed him the balance of the $15,000.

¶ 32 Therefore, on remand, we direct the superior court to also enter judgment against UWM on Calisi's unpaid wage claim.

### IV. Attorneys' Fees and Costs in the Superior Court

¶ 33 Both Calisi and UFS requested an award of attorneys' fees and costs at trial. The superior court denied their competing requests because "each party [had] prevailed on at least part of their claims." Because we have vacated the court's judgment in UFS's favor on its trade secret claim, Calisi, not UFS, was the successful party at trial. We therefore remand this matter to the superior court so it may reconsider Calisi's request for an award of court costs and attorneys' fees on the unpaid wage claim. A.R.S. §§ 12–341 (2003), –341.01(A) (Supp.2012). We express no opinion whether, on remand, the superior court should award Calisi fees under A.R.S. § 12–341.01(A).

### CONCLUSION

¶ 34 For the foregoing reasons, we vacate the judgment in UFS's favor on its trade secret claim and affirm the judgment in Calisi's favor on his unpaid wage claim. We remand this matter to the superior court with instructions to enter judgment in Cali-

si's favor on UFS's trade secret claim, enter judgment in Calisi's favor and against UWM on the unpaid wage claim, and reconsider Calisi's request for an award of costs and attorneys' fees at trial as to the unpaid wage claim.

¶ 35 Pursuant to his request and as the successful party on appeal, we award Calisi his costs under A.R.S. § 12–341 and reasonable attorneys' fees under A.R.S. § 12–341.01(A), contingent upon his compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

CONCURRING: ANDREW W. GOULD and RANDALL M. HOWE, Judges.