
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

GUIDANCE RESIDENTIAL, LLC ,　　　　)
　　　　　　　　　　　　　　　　　　)　　No. 75507-2-I
　　Appellant/Cross Respondent,　　　)
　　　　　　　　　　　　　　　　　　)　　DIVISION ONE
　　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　UNPUBLISHED OPINION
ANWER MANGRIO and JANE DOE　　　　)
MANGRIO, husband and wife, and their　)
marital community; MOHAMED AIJAZ　　)
HUSSAIN and JANE DOE HUSSAIN,　　　)
husband and wife, and their marital　　　)
community; UNIVERSITY ISLAMIC　　　)
FINANCIAL CORPORATION; and　　　　)
UNIVERSITY BANK,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　Respondents/Cross Appellants.　　　)　　FILED: December 18, 2017
　　　　　　　　　　　　　　　　　　)

APPELWICK, J. — The jury found that use by former employees of client lists compiled while employed by Guidance was a willful and malicious misappropriation of trade secrets. But, the trial court declined to award exemplary damages to Guidance. The trial court sealed trial exhibits related to client lists posttrial. Mangrio challenges the determinations that the client lists were trade secrets, that they were misappropriated, the determination of damages, the award of attorney fees, and the sealing of the trial exhibits. Mangrio successfully defended against Guidance's breach of contract claims under a contract providing for recovery of fees actually incurred. The trial court awarded Mangrio fees using the lodestar method. Guidance challenges the use of the lodestar method and the failure to award exemplary damages.

We affirm that the client lists were trade secrets, the jury verdict for misappropriation, and the sealing of the trial exhibits. We vacate the award of attorney fees to Mangrio on the contract claims using the lodestar method and remand for award of fees actually incurred consistent with the contract. We vacate the trial court's denial of exemplary damages to Guidance, and remand for reconsideration.

## FACTS

Guidance Residential LLC and competitor University Islamic Financial Corporation (UIF), provide Sharia-compliant mortgages to the Muslim community. The Sharia-compliant mortgage industry is extremely competitive, as there is a limited pool of customers from which to draw. In 2011, Guidance employees, Anwer Mangrio and Mohamed Hussain, along with others, left Guidance to work for competitor, UIF.

At Guidance, the former employees collected information about potential customers and compiled potential and current customer lists. The former employees testified that they kept personal lists of contacts that included names, phone numbers, and e-mail addresses. After the customer showed interest in prequalification or refinancing, the employee entered the potential customer's full name, phone number, e-mail address, and information about their property into Guidance's loan operating system. Guidance contended that, in part, what makes

its lists distinctive is that a person's presence in their database indicates that the person has at least sought to be prequalified for a Sharia-compliant mortgage.

After the information was entered into Guidance's system, each employee could access a "Book of Business," an Excel spreadsheet created by the operating system. The Book of Business contains the information the employee entered into the Guidance system, as well as information the disbursed contracts automatically updated. The Book of Business includes customer name, contract share, contact information, such as address, telephone number and e-mail, address and type of property for which services were sought, credit score, total income, and total liability. Guidance required its employees to protect customer information and keep this information confidential.

Before the former employees left Guidance, they downloaded and e-mailed the Books of Business they could access to their personal accounts. Former employee, Hussain, directed other former employees to download the Books of Business. At UIF, Hussain assisted Guidance's former employees in contacting "closed customers"[1] from Guidance, to generate business for UIF. Hussain also assisted Guidance's former employees target other categories of Guidance customers, such as those listed as "withdrawn," "declined," and "pipeline."[2]

---

[1] The Books of Business files organize Guidance potential and current customers into categories. "Closed" indicates that the application resulted in a closed mortgage, or funded loan.

[2] "Withdrawn" customers are those that did not continue with the application process after being prequalified. "Declined" customers are those whose

Guidance filed suit against former employees, Mangrio and Hussain, their new employer, (UIF), and UIF's parent company, University Bank. Among other claims, Guidance alleged that Mangrio and Hussain breached noncompete clauses in employee contracts and duties of loyalty. The trial court, finding the noncompete clauses void, dismissed Guidance's breach of contract claims on summary judgment. That decision is not appealed. Guidance also alleged that all four respondents misappropriated Guidance's trade secrets, namely its customer and prospect lists.

After a lengthy trial, the jury returned a verdict in favor of Guidance's claim of misappropriation of trade secrets, but rejecting Guidance's breach of duty claims. The jury found that Mangrio, Hussain, UIF, and University Bank (hereafter collectively referred to as "Mangrio" unless otherwise indicated) had engaged in actions that were "willful and malicious" under the Uniform Trade Secrets Act (UTSA). RCW 19.108.030. The jury awarded $848,000 in damages to Guidance for the financial harm caused from the misappropriation of trade secrets. The jury did not find that there had been unjust enrichment. Subsequently, the trial court denied the defendants' motions for a directed verdict and for judgment as a matter of law on Guidance's trade secret claim.

---

applications did not result in closed mortgages. "Pipeline" customers are those who have open applications with Guidance.

After the verdicts, Guidance moved for an award of exemplary damages, prejudgment interest, and reasonable costs and attorney fees for prevailing on the UTSA claims. The trial court declined to award exemplary damages to Guidance. The trial court awarded the corrected amount of $582,378.37 in attorney fees to Guidance, after considering the amount of time counsel spent on successful versus unsuccessful claims, the hours reported to the court, and the reasonableness of counsel's hourly rates. The court also awarded $11,271.85 in costs to Guidance.

After trial, the court issued an order partially granting Guidance's motion to seal trial exhibits, sealing exhibits containing customers' restricted personal identifiers, such as Social Security numbers and telephone numbers, until presentation of copies with that information redacted. The trial court subsequently granted Guidance's order for reconsideration of the scope of order sealing confidential trial exhibits. It further sealed exhibits containing consumer e-mail addresses, credit scores, and household incomes and liabilities where the information is tied to an individual in a document, until presentation of copies with that information redacted.

Mangrio moved for attorney fees for prevailing on the noncompete contract claims. The court awarded Mangrio $182,135.25 in attorney fees and $5,878.20 in costs. The trial court calculated defense counsel attorney fees using reasonable

hourly rates from Guidance's declarations, and not fees charged by Magrio's counsel.

## DISCUSSION

I.  Mangrio's Cross Appeal Claims

The linchpin of this case is whether Mangrio misappropriated Guidance's trade secrets under the UTSA. Therefore, we first address Mangrio's claim on cross appeal that the trial court erred in denying his motions for judgment as a matter of law on the trade secret claims. Second, we address Mangrio's claim that the trial court erred in awarding attorney fees to Guidance. Third, we address Mangrio's argument that the court erred in granting Guidance's motion to seal confidential exhibits after trial.

### A.  Judgment as a Matter of Law

Mangrio argues that the trial court erred in denying his motions for judgment as a matter of law as to Guidance's trade secret claims. First, he argues that, as a matter of law, Guidance's claim as stated was not a violation of the UTSA, because the personal contact lists and Books of Business the former employees retained when they went to UIF were not trade secrets. He contends that the personal contact lists were not trade secrets, because Guidance never had possession of them. And, the Books of Business were not trade secrets, because all the valuable information they contained was available elsewhere. Second, he argues there was no substantial evidence that Guidance suffered lost profits, and

that Guidance failed to provide a reasonable method to calculate lost profit damages.

This court reviews de novo a trial court's order denying a motion for judgment as a matter of law. Estate of Bordon v. Dep't of Corr., 122 Wn. App. 227, 240, 95 P.3d 764 (2004). In reviewing the ruling on the motion, this court interprets the evidence against the original moving party and in a light most favorable to the opponent. Faust v. Albertson, 167 Wn.2d 531, 537-38, 222 P.3d 1208 (2009). A judgment as a matter of law requires the court to conclude that, as a matter of law, there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party. Id. at 538. The court must defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence. State v. Hernandez, 85 Wn. App. 672, 675, 935 P.2d 623 (1997). Overturning a jury verdict is appropriate only when the verdict is clearly unsupported by substantial evidence. Faust, 167 Wn.2d at 538. Judgment as a matter of law is appropriate only when there is no substantial evidence to support a verdict. Id. at 537.

1. The Book of Business Client Lists Were Trade Secrets

To establish a trade secret misappropriation claim, a plaintiff must show that a legally protected trade secret exists. Ed Nowogroski Ins., Inc. v. Rucker, 88 Wn. App. 350, 356-57, 944 P.2d 1093 (1997), aff'd, 137 Wn.2d 427, 971 P.2d 936 (1999). Under the UTSA

7

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

    (a)    Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

    (b)    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.108.010(4). Whether a customer list is protected as a trade secret depends on three factual inquiries: (1) whether the list is a compilation of information; (2) whether it is valuable because unknown to others; and (3) whether the owner has made reasonable attempts to keep the information secret. Rucker, 137 Wn.2d at 442.

In Washington, generally customer lists belonging to the employer are trade secrets. See Thola v. Henschell, 140 Wn. App. 70, 78, 164 P.3d 524 (2007) ("Generally, taking an employer's confidential customer list without permission is a trade secret misappropriation."). However, there is a distinction between customer lists of names or information that is readily ascertainable and lists that contain information that the employer expended substantial efforts to identify, cultivate, and keep confidential. See Robbins, Geller, Rudman & Dowd, LLP v. Office of Att'y Gen., 179 Wn. App. 711, 722, 328 P.3d 905 (2014); see also Calisi v. Unified Fin. Servs., LLC, 232 Ariz. 103, 106-07, 302 P.3d 628 (2013) (applying Arizona's UTSA, which employs the same definition of "trade secret").[3]; see also McCallum

_____

[3] Almost all states have enacted the UTSA (or some version thereof) to make uniform traditional common law trade secret protections. Thola, 140 Wn. App. at 78. "This chapter shall be applied and construed to effectuate its general

8

v. Allstate Prop. & Cas. Ins. Co., 149 Wn. App. 412, 424, 204 P.3d 944 (2000) (a key factor in determining whether information has economic value under the UTSA is the effort and expense that was expended to develop the information).

Mangrio asserts that, because the former employees maintained personal contact lists which Guidance never possessed, Guidance did not have a protectable trade secret in the Books of Business. The former employees kept lists of their own with names and contact information.[4] For instance, in former employee Mangrio's testimony about making initial contact with potential customers, he states,

> Q. . . . Let's say you go to a mosque, you put down your card, you meet people, and somebody is now interested in -- in getting an Islamic mortgage, okay? So they contact you. Now, will you -- will you take us through the steps now of what happens?
>
> A. So, initially, when they contact me -- first time usually people call they ask questions. So I take their number -- phone number, email [sic] address, and name and enter it in my Outlook Express immediately. That's how I get my database.

---

purpose to make uniform the law with respect to the subject of this chapter among states enacting it" RCW 19.108.910.

[4] The Washington Supreme Court has held that trade secrets include copied lists of customers or information about them, that the former employer is still in possession of such information, even when the former employees added to such lists. See J.L. Cooper & Co. v. Anchor Sec. Co., 9 Wn.2d 45, 64-65, 113 P.2d 845 (1941). While J.L. Cooper predates the UTSA, our Supreme Court has held that the common law rule prohibiting the solicitation of a former employer's customers with confidential information remains intact under the UTSA. Nowogroski, 88 Wn. App. at 357. In J.L. Cooper, the court noted that lists of customers, even when partly prepared by the defendant, are the absolute property of the employer. 9 Wn.2d at 65. Further, the court noted that employers are entitled to relief when former employees, for their own interests or for a new employer's, use lists of customers that were acquired because of their former employment and regarded as confidential. Id.

The evidence clearly established that the former employees compiled lists of customer information for Guidance while employed by Guidance. In testimony from witness Suha Zehl, the former chief information officer with Guidance, she explained that employees enter customer data initially into Guidance's CRM (point of sales system) system:

Q. . . . And so could you maybe walk me through to how data gets into these various systems if we started with point of contact with an account executive and a potential customer? . . .

A. . . . [Account executive']s are trained and have been told that any customer information needs to be entered into the CRM even if the customer was not ready to move forward because we have to track that information. . . .

Q. . . . What use do you make of the data in the CRM system? What are you doing with that data?

A. The first thing is you need to understand what's -- you know, what's the required information. To get a prospect, we need their name, we need their e-mail [sic], we need their phone number so that we have a prospect or a lead to- -- to move forward with.

The contact information undisputedly became part of the information which was maintained in the Guidance system in the Book of Business to which the agent had access. The fact that the agent kept a duplicate, personal copy of contact information did not change the fact that the information was collected in the course of employment, not from public sources but from potential clients, and was entered into Guidance system. Guidance had possession of the information in the Book of Business.

Zehl testified that once customers express interest in prequalification, employees obtain more of the customer's information for Guidance's LOS (alternatively loan origination system or loan operating system). Former employee Mangrio also testified about when he entered information into Guidance's system:

A.    . . . If the customer interested [sic], then ask -- then ask them full information, their other -- like, you know, if they want to prequalify, then we need how much property -- purchase price they want for the property, how much down payment can there be, and then there's also good number all [sic] of the information

. . . .

Q. And then where does that go?

A. That information goes in an LOS system -- where the [sic] Guidance has an LOS system. . . .

. . . .

Q. Loan operation—or operating system?

A. Loan operating system, yes.

The evidence showed that the information in the customer lists included items not available in public records. In testimony about information in Guidance records in exhibit 44, UIF Chief Operating Officer, Julie Burzynski, states,

Q.    . . . So is there anywhere in the public records you can find individuals who have prequalified?

A.    Likely no.

And in testimony from former employee Hussain,

> Q. Okay. If you have a universe, say, of 5,000 (inaudible) . . .
>
> . . . .
>
> Q. . . . And that universe of contacts, absent information from the LOS, you would have no way of knowing these individuals' interests or whether they had been prequalified for a Shariah-compliant [sic] mortgage?
>
> A. That's correct, yes.

Mangrio contends that the valuable information that the Books of Business contained was available elsewhere. He asserts that Guidance waived any protectable trade secret, because information about customers who successfully obtain a loan or mortgage would be available in the recorded deed or mortgage. He relies on testimony from Burzynski, in which she states,

> Q: . . . But I want to go back to the public record part of your testimony and the deeds . . . .
>
> . . . .
>
> Q: -- and the mortgages. Is that something new?
>
> A. No. They've been doing that for -- actually I don't know -- years and years and years and years these have been part of the public record. We see deeds from 50 years ago.
>
> . . . .
>
> There are all kinds of different things that would come up where we would get a copy of the things on public record. . . .
>
> Q. . . . UIF could obtain records of all Guidance Residential transactions from the beginning of Guidance Residential's existence?

A. If we wanted to, we could -- we could go out and get a copy of everything that was publicly recorded, yes.

He further argue that third-party companies could provide the customer information for a fee.

But, even if Mangrio could have compiled a list of former Guidance borrowers from public records, Mangrio has not demonstrated that all of the other information in the Book of Business files was publicly available. Nothing in a recorded deed would indicate that the mortgage was Sharia-compliant, a factor that distinguishes Guidance and UIF's customer base from mortgage customers in general. The deed information would not have identified Guidance's customers in the process of obtaining a mortgage or loan. Nor has he established that the compilation of data—the linking of individual interest in Sharia lending, their income, assets, liabilities, prequalification, credit scores, Social Security numbers, prior history with Guidance and the like—was publicly available. Moreover, the compilation of this information in the Book of Business gave the information enhanced value. See Nowogroski, 137 Wn.2d at 449-50.

There was also evidence that Guidance took reasonable steps to protect its trade secrets. At trial, Guidance presented evidence of its policies requiring employees to keep information about clients confidential, such as the transaction code of ethics in the employee handbook. The code instructs employees to "[m]aintain absolute confidentiality of all consumers, as well as other 'inside information'" and to "[m]aintain the confidentiality of the underwriting process and

13

system." The former employees signed forms acknowledging their receipt of the employee handbook. There was testimony from former employee Hussain that he acknowledged Guidance's privacy and confidentiality policies while employed:

> Q. Okay. If we look at Exhibit 11, one of the things that it discusses is an employee code of conduct, correct?
>
> A. Correct.
>
> . . . .
>
> Q. And if you look on page 34, which is page 37 of the document, there's actually a specific policy section dedicated to confidential information and nondisclosure, correct?
>
> A.-Yes; correct.
>
> Q. And this policy indicates that it applies both during employment and after you leave your employment, correct?
>
> A. Correct.
>
> Q. And that you must promptly return confidential documents and other materials you may have, correct?
>
> A. Correct.
>
> Q. And that you're not permitted to retain copies of any material, right?
>
> A. Correct.
>
> Q. It even tells you if you have questions, you should consult with the legal department. Maybe a little small there. Section 7 there, right?
>
> A. (No audible response.)

Q.    Did you ever have any questions about this? Do [sic] you ever consult the legal department about what was or wasn't considered protected under this policy?

A.    No, I didn't.

Q.    And then if we look in this same section, it appears this document goes on to explain a couple of particular types of information[5] that Guidance considers confidential, correct?

A.    Sure.

Q: Was that a "yes," correct?

A.    Guidance considering it confidential, yes.

Q.    Okay. And you had acknowledged that you were going to abide by this policy, right?

A.    Correct.

Q.    And one of the items is customer lists that we see?

A.    Correct.

---

[5] The employee handbook in this section states:

The protection of confidential business information and trade secrets is vital to the interests and the success of Guidance Residential. Such confidential information includes, but is not limited to, the following examples:

- Compensation data
- Computer processes
- Computer programs and codes
- Customer lists
- Customer preferences
- Financial information of any type, including Guidance Residential and customer information

This indicates that Guidance clearly considered the Books of Business, customer lists and customer information, confidential.

In addition to its written policies, Guidance notified its customers of its confidentiality policy and its training of employees regarding its policies. Heidi Partida, vice president of human resources employee at Guidance, testified,

> Q.    . . . And, Ms. Partida, I think you had already started explaining this, but this is something that you provide to your customers, correct?
>
> A.    Yes, it is.
>
> Q.    And what -- you can read this or summarize for me -- do you tell your customers about what you will or won't do with their information?
>
> A.    We are committed to protecting our customers' privacy. Protecting their trust in us. They -- this document lets them know that during the course of our transaction with them, we are going to be collecting personal information -- Social Security number, financial status, pay information, all of these things -- that would not be available anywhere else. And we are committed to protecting their privacy and that information, so this is what we tell them. We are very highly regulated. We -- we need to let them know their information is safe with us.
>
> Q.    And it also appears to indicate on this document that you regularly conduct training sessions.
>
>        Is that something that's (inaudible)?
>
> A.    Yes, we do.
>
> . . . .
>
>        It's not my area of responsibility. There is a compliance department that does that. But also the training -- all account executives and regional managers and national managers who are required to be licensed have to go through additional training and continuing education training by the states every year to let them know what this is about and the importance of customer privacy.

Q. You mentioned licensing.

Do field sales employees of Guidance have to be licensed?

A. Yes, they do.

Q. And how about unlicensed people? Do you ever have situations where there were unlicensed people who were working in the field for Guidance?

A. Not for Guidance, no.

And, in terms of the licensing requirement, Hussain testified,

Q. And what did that licensing entail?

A. After the real estate crisis that we went through, the laws now require every loan originator to have a federal license, and you have to get this license first. You have to take 20 hours of classroom courses, and then you have to do some fingerprints and some other requirements. And once you fulfill them and you pass an exam, then you become NMLS [nationwide mortgage licensing system] federally licensed, and then there are some states that require their own specific licenses as well.

Q. And as part of that licensing or to maintain your license, do you have to take continuing education?

A. Yes, you do.

. . . .

Q. . . . .

What subject maters are covered in these (sic) licensing-required education?

A You know, I don't remember. I took the 20-hour course back in 2008, 2009. They cover various things, including, as you're leaning towards, ethics and so forth.

So, yeah. It's -- it covers -- it covers a gamut of subject matter the government wants you to learn and understand.

> Q.    Mostly it has to do with fraud prevention and how you treat customers and -- and so forth. That's what the gist of the training is.
>
> Q.    And do they talk about customer privacy?
>
> A.    I'm sure they do, yeah, because customer privacy must be part -- I don't remember exactly, but I'm -- I'm sure customer privacy is part of it. You have to protect customers' personal information, and you have to shred it as soon as it will -- the loan is done.
>
> So you can't hang on to people's paychecks and W-2s and so forth, so all of that has to be shredded immediately. There are some very specific rules. You can't do certain things and so forth, yes.

Therefore, there was substantial evidence before the jury that the Books of Business were compilations of information, that they contained valuable customer information that was not readily ascertainable (even if a portion of the information was publicly available), and that Guidance took reasonable steps to ensure the confidentiality of its customer lists. These are the three elements of a trade secret. See Nowogroski, 137 Wn.2d at 442.

We conclude that the Books of Business were trade secrets.

## 2. The Trade Secrets were Misappropriated

The portion of the UTSA's definition of "misappropriation" that applies here proscribes the disclosure or use of a trade secret of another without express or implied consent by a person who, at the time of disclosure or use, knew or had reason to know his or her knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. RCW 19.108.110(2)(b)(ii)(B). A former employee misappropriates an employer's trade

secrets by soliciting customers from a confidential customer list that has independent value, because its contents are unknown and subject to reasonable efforts to keep secret. See Nowogroski, 137 Wn.2d at 449-50. The UTSA makes no distinction about the form of trade secrets; whether the information is on a compact disk, a hard paper copy, or memorize by the employee, the inquiry is whether it meets the definition of a trade secret and whether it was misappropriated. Id.

The evidence before the jury clearly established that before the former employees left Guidance, they downloaded and e-mailed the Books of Business they could access to their personal accounts. Former employee Mangrio testified,

> Q. . . . Mr. Mangrio . . . you left Guidance on March 31, 2011, correct?
>
> A. That's correct.
>
> Q. And do you recall the last time that you downloaded your book of business file . . . .
>
> . . . .
>
> A. I don't remember the exact date, probably March. Because we used to update every month, every two weeks. When our -- anything change [sic], happen, I used to refresh it.
>
> Q. And after you updated your book of business file in the March time frame, you emailed [sic] that to yourself, correct?
>
> A. That's correct.

There was also evidence that former employee Hussain directed other former employees to download the Book of Business before leaving Guidance. Junaid

19

Iqbal, an employee who left Guidance, joined UIF, and at the time of trial had returned to Guidance testified,

Q.      When you left, did you download your book of business?

A.      Yes.

Q.      Why did you do that?

A.      In a recent conference call prior to departure, it was asked of us by Aijaz [Hussain].

At UIF, Hussain directed Guidance's former employees to contact "closed customers" from Guidance, to generate business for UIF.[6] Hussain testified,

Q.      And that's your second day at UIF, correct?

A.      Sure . . . .

Q.      And on that second day of work, you're telling them to—that you've created a letter for their closed customers, right?

A.      Correct.

Q.      And that's the customers that they worked with when they were at Guidance, correct?

A.      Yes. Their customers they brought to Guidance by—through their marketing efforts, so, yes.

---

[6] Former employee Hussain sent an e-mail to the other former employees who had joined UIF, Mangrio, Iqbal, Zeeshan Ali, and Omer Mahmood, with a letter for the team to send to the list of closed customers from Guidance. The letter Hussain directed the other employees to send went beyond a professional announcement announcing a change of affiliation and actively solicited business for UIF. See Nowogroski, 137 Wn.2d 427, 440 fn.4 (distinguishing former employees active solicitation of customers and professional announcement of a change of employment). It stated, in part, "UIFC offers financing under two Islamic models . . . in most cases more competitively priced than Guidance's Musharaka model."

Hussain also assisted Guidance's former employees solicit other categories of Guidance customers, such as those listed as withdrawn, declined, and pipeline. Hussain testified,

> Q. . . . In looking at Exhibit 34, is this your recollection? Mr. Mangrio reported back to you that he had send his emails [sic] to his closed customers, right?
>
> A. Correct.
>
> Q. And then he asks you to start drafting an email [sic] so he can start emailing [sic] pipeline and different groups, right?
>
> A. Correct.
>
> Q. And these pipeline and different groups, we're talking about the groups that are in the book of business file, right?
>
> A. Yeah. Anwer [Mangrio] has in his -- whatever list he has. . . .
>
> Like I said, I mean everybody did their own marketing. I'm just helping him draft a general letter about the company, and he has moved from Guidance to UIF.
>
> Q. Okay. But here, at least, he's asking you to create an email [sic] for pipeline, and you tell him you'll work on it today, right?
>
> A. Correct.
>
> Q. And then later still, your group asks you or you create for them another type of email [sic] to go out to withdrawn and declined customers, right?
>
> A. Correct.
>
> . . . .
>
> Q. And, again, you tell them that these letters have to go out ASAP [(as soon as possible)], right?
>
> A. Correct.

The evidence also clearly established that the former employees used Guidance's customer information at UIF to generate business for UIF.[7]   For instance, former employee Mangrio testified,

Q.   And so you would agree with me, then, that you're providing Ms. Ahmad with your book of business from Guidance to use to contact customers to generate business for UIF?

A.   Yes . . . .

Q.   And, Mr. Mangrio, you closed a number of mortgages at UIF relating to the individuals whose contact information you sent to Ms. Ahmad, correct?

A.   Yes.

Substantial evidence allowed the jury to find that Guidance's former employees misappropriated Guidance's trade secrets and used them to solicit customers while at UIF.

### 3.  Substantial Evidence of Damages

Mangrio argues that Guidance failed to provide substantial evidence of lost profits caused by misuse of trade secrets, and failed to provide a reasonable method to calculate the amount of such damages.  A plaintiff may recover lost profits if the evidence establishes the damages with reasonable certainty.  Eagle Group, Inc. v. Pullen, 114 Wn. App. 409, 418, 58 P.3d 292 (2002).  The reliability of such evidence is for the trier of fact to determine.  Id. at 419.

---

[7] Former employee Hussain testified that he had an intern at UIF, Smayyah Baig, make lists of the contacts he retained from Guidance lists, so that he could send out blast e-mails with special offers from UIF.

Both parties presented testimony as to their theories of proper damages. Guidance presented lost profits and unjust enrichment[8] theories of damages. The lost profit calculation was the number of client transactions lost times the average profit per transaction. Guidance provided testimony that between 170 (Zehl) and 174 (Viswanadhan Kumar) of Guidance's customers listed in the misappropriated Books of Business completed transactions with UIF in 2011-2013. Mangrio's expert, Todd Menenberg, testified that lost profits for Guidance could be attributed to as few as 18 or 22 transactions. Kumar testified for Guidance that, on average, each contract for Guidance produces $10,477. Harold Martin, for Guidance, testified that lost profits for Guidance on each lost contract was $11,147. On the other hand, Mangrio testified that Guidance made approximately $10,000 per transaction. Menenberg provided expert testimony that lost profits per customer transaction was $10,600. Kumar asserted that retention rates were historically 68 percent. This is the number of customers who would be expected to refinance with Guidance within five years. Menenberg testified that number was inflated by 56 to 64 percent (making it roughly only 24-31 percent). Guidance's former chief financial officer and chief credit officer, Nicholson Minardi, testified that by 2013 the retention rate was at 47.24 percent.

---

[8] The jury did not award unjust enrichment damages, and this is not appealed.

The method of determining damages was reasonable. The evidence presented allowed the jury to apply that method. The jury is free to accept or reject the evidence provided, so long as the verdict is within the range of the evidence. See Nowogroski, 88 Wn. App. at 359. It appears the jury awarded lost profits to Guidance for 80 customer transactions, accepting Mangrio's expert's testimony of $10,600 per lost transaction.[9] The jury award of $848,000 is within the range of evidence provided.

### 4. Conclusion

While Mangrio refutes Guidance's trade secret claims, the Books of Business retained by the former employees when they left Guidance were trade secrets. The former employees misappropriated this information to solicit Guidance's customers. There was substantial evidence before the jury that this misappropriation caused Guidance to suffer lost profits, and the jury appropriately awarded damages within the range of evidence provided. We conclude that the trial court properly denied Mangrio's motion for judgment as a matter of law as to Guidance's trade secret claims.

### B. Attorney Fees on Trade Secret Claims

Mangrio claims that the trial court erred when it awarded Guidance attorney fees for prevailing on its claims under the UTSA.

---

[9] The record does not reveal the jury's computation. Whether coincidence or not, 170 clients times 47.24 percent retention rate rounds to 80 customers.

Since Guidance prevailed on its trade secret claims, the trial court is entitled to award attorney fees under the UTSA. RCW 19.108.040. The trial court awarded Guidance attorney fees using the lodestar methodology. It determined the hours Guidance's counsel claimed and the hourly rates charged by Guidance's counsel were reasonable. The trial court excluded work on unsuccessful claims.

The trial court did not abuse its discretion in making this award of fees.

C. Order Granting Motion to Seal Trial Exhibits

Mangrio argues that the trial court erred in granting Guidance's motions to seal trial exhibits. He argues that Guidance waived any right to request to seal the information after it displayed the information in open court. Additionally, he argues that the court did not find that the unsealed information represented a serious and imminent threat to an important interest.

A court record may be sealed if a court enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record. GR 15(c)(2). A trial court's decision to a seal a court record is reviewed for abuse of discretion. Hundtofte v. Encarnación, 181 Wn.2d 1, 6, 330 P.3d 168 (2014). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds. Id.

A court must analyze a motion to seal using the five-step approach outlined in Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982).

25

Hundofte, 181 Wn.2d at 7. First, the party seeking to seal court records must show a serious and imminent threat to some important interest, if not to protect a right to a fair trial. Id. at 8. Second, anyone present when the motion is made must be given an opportunity to object. Id. Third, the court must determine whether the requested method is the least restrictive means available and effective in protecting the interests threatened. Id. Fourth, the court must weigh the competing interests of the party and the public, and it must consider alternative methods to protect the interest. Id. Fifth, the order must not be broader than necessary to protect the interest. Id.

Mangrio challenges only one Ishikawa factor in this case, that the party requesting to seal records must show a serious and imminent threat to some important interest. The court granted sealing[10] of trial exhibits that contained nonparty consumer e-mail addresses, credit scores, and/or household incomes and liabilities in circumstances where the information was tied to an identifiable

---

[10] Initially, the court sealed exhibits that contained restricted personal identifiers, i.e., Social Security numbers and telephone numbers. Upon reconsideration, the trial court expanded its initial sealing order, sealing exhibits containing e-mail addresses, credit scores, and/or household incomes and liabilities, until presentation of documents with the specific information redacted. When asked for clarification at the first hearing regarding sealing, the court stated, "The unredacted documents will remain in the court record sealed . . . so the public can't look at them. The redacted documents will remain in the court record . . . to be seen . . . with references to the ones that they can't see." The record does not indicate whether any party presented copies with redactions. The record that reached this court did not have redactions. Mangrio's brief regards the court's action as sealing. Guidance's brief refers to redaction and sealing interchangeably. We treat this issue as if the exhibits remain sealed.

individual within a document. The trial court found that this was appropriate and warranted because

> important public policy reasons support keeping the requested materials out of the public view, including an interest in protecting consumer privacy and an interest in maintaining public trust in the safety and security of information provided to financial institutions in connection with contemplated transactions.

The court's written findings satisfy the first Ishikawa factor, a serious and imminent threat to some important interest.

Citing Woo v. Fireman's Fund Insurance Co., 137 Wn. App. 480, 154 P.3d 236 (2007), Mangrio argues that Guidance waived its right to restrict the future use of information when it displayed it in open court. In Woo, this court found that the information the party wanted to seal, insurance company manuals that had been used as exhibits at trial, did not qualify as trade secrets. Id. at 492. It also noted that Fireman's Fund did not make reasonable efforts to maintain their secrecy, as it did not move to seal the exhibits until two years after they had been used at trial. Id. at 491. Because the manuals were not trade secrets, and Fireman's Fund did not present a compelling interest to seal the information, the court found that the trial court abused its discretion in granting the request to seal them. Id. at 493.

Woo is distinguishable because the records in that case were not trade secrets, whereas here there was a finding that the customer lists were trade secrets. The UTSA specifically provides for sealing trade secrets used in the action. RCW 19.108.050. Moreover, the trial court sealed the trial exhibits with

27

private consumer information because it found a compelling interest in protecting consumer privacy and maintaining public trust in the safety and security of information provided to financial institutions. Further, in Woo, this court found that Fireman's Fund did not make reasonable efforts to maintain the exhibits' secrecy, as it waited two years after trial to move the court to seal. Here, there was a hearing on the sealing of exhibits within a month and a half of the trial verdict. This delay was not unreasonable. Thus, the reasoning in Woo does not require the trial court to find that a party waived confidentiality, either from using the information in open court or from making a motion posttrial to redact or seal.

The court did not abuse its discretion in redacting and sealing consumers' private information in trial exhibits after the trial.

II.    Guidance's claims

Guidance argues the trial court abused its discretion in declining to award exemplary damages. Second, Guidance argues the trial court erred in its method of calculating attorney fees awarded to Mangrio for prevailing on breach of contract claims. Third, Guidance argues that it is entitled to attorney fees for prevailing on appeal.

A. Exemplary Damages

Guidance appeals the trial court's decision not to award exemplary damages under the UTSA. Under the Act, if willful and malicious misappropriation

28

exists, a trial court may award exemplary damages in an amount not exceeding twice any award of damages recovered for actual loss. RCW 19.108.030(2).

A trial court's decision to award exemplary damages and fees under the UTSA is discretionary and we will not reverse the amount unless the trial court decision is clearly erroneous. Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 61-62, 738 P.2d 665 (1987). Guidance argues that because the jury found Mangrio's actions willful and malicious, the trial court abused its discretion in failing to award exemplary damages.

Guidance first points to Boeing. In Boeing, the court affirmed the award of exemplary damages because the record showed that Boeing knew its actions were of "dubious legality," and it engaged in an effort to disguise its misappropriation. Id. at 62. Guidance also cites to Eagle Group. In Eagle Group, the court affirmed the award of exemplary damages after the jury found the defendants acted willfully in their misappropriation. 114 Wn. App. at 423-24. There, a former employee of Eagle Group took employees, clients, and files to another general contracting firm. Id. at 412.

Mangrio relies on Nowogroski, in which this court affirmed the denial of exemplary damages on successful trade secret claims under the UTSA. 88 Wn. App. at 360. However, Nowogroski contains no discussion of the record on which the trial court made its determination to deny exemplary damages. Id. It merely

indicates that Nowogroski had not shown the decision was clearly erroneous. Id. It does not direct a result in this case.

The trial court's findings, as well as the record, indicate that Guidance is entitled to seek exemplary damages under the UTSA. RCW 19.108.030(2). The jury found that Mangrio acted willfully and maliciously. The court noted that the actions were "calculated and deliberate" in misappropriating Guidance's trade secrets. This language can be found in a case to which the Boeing court cites, Sperry Rand Corp. v. A-T-O, Inc., 447 F.2d 1387 (4th Cir. 1971). Boeing, 108 Wn.2d at 62. In Sperry Rand, the court upheld exemplary damages because the record showed the defendants' actions were " 'calculated,' 'deliberate,' and 'reprehensible.' " Id. at 1394-95. Given the jury's finding, here, that the misappropriation was "willful and malicious," as well as the court's finding that the actions were "calculated and deliberate," exemplary damages are proper.

In its judgment denying exemplary damages, the trial court made the following findings:

1. The jury found that the defendants each acted willfully and maliciously in misappropriating the plaintiff's trade secrets;

2. The defendants' actions in misappropriating the plaintiff's trade secrets was calculated and deliberate.

3. Considering all the facts and circumstances, including the plaintiff's modest success, exemplary damages are not warranted.

The trial court's third finding is apparently the basis for denial of exemplary damages: "Considering all the facts and circumstances, including the plaintiff's

modest success, exemplary damages are not warranted." It is unclear from the record whether the trial court limited its consideration of facts and circumstance to those of the trade secrets claim, rather than the totality of the litigation, in finding that Guidance had "modest success." For instance, the fact that Guidance did not prevail on its contract claims is not a proper consideration as to exemplary damages.[11] Nor is the fact that Guidance's recovery for lost profits was not accompanied by an additional award for unjust enrichment. It is not the amount of recovery that triggers the eligibility for exemplary damages, it is the finding of willful and malicious conduct that triggers it, regardless of the size of the recovery for actual or enrichment damages. Excluding consideration of the contract claims and alternative damages theory, it is not clear factually why the trial court regarded the award for $848,000 in actual damages as "modest success".

An award of exemplary damages[12] is not mandatory under the UTSA when a finding of willful and malicious conduct is made. RCW 19.108.030(2). The purposes of awarding punitive, or exemplary, damages are to punish the person doing the wrongful act and to deter him and others like him from similar conduct in the future. RESTATEMENT (SECOND) OF TORTS § 908(1) & comment a (AM. LAW INSTITUTE 1979). Here, the trial court's order contains no discussion of deterrence

---

[11] RCW 19.108.030 makes no mention of contract claims, but ties exemplary damages to willful and malicious misappropriation. If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award for actual loss caused by the misappropriation. Id.

[12] The term, "exemplary damages," is interchangeable with "punitive damages." Black's Law Dictionary 472, 474, 692 (10th ed. 2014).

or punishment. On this record, we cannot determine that the trial court's decision was not clearly erroneous.

We vacate the trial court's decision declining to award exemplary damages and remand for reconsideration of this issue.

## B. Attorney Fees under Breach of Contract Claims

Guidance argues that the trial court erred in calculating the award of attorney fees to Mangrio for prevailing on Guidance's breach of contract claims. First, it argues that, under the Guidance employee contracts, Virginia law must govern the court's method of determining attorney fees.[13] Second, it argues that the trial court should have limited its award to the amounts actually incurred by the defendants on the breach of contract claims, pursuant to the contracts.[14] Guidance asserts that the trial court erroneously calculated defendants' attorney fees using the reasonable hourly rate put forth by Guidance, instead of the actual fees incurred. Mangrio asserts that Washington law governs the correct method of determining attorney fees on the breach of noncompete contract claims.

---

[13] The agreement between Guidance and its former employees states, in pertinent part, "This Agreement shall be construed in accordance with, and all actions arising under or in connection therewith shall be governed by, the internal laws of the Commonwealth of Virginia (without reference to conflict of law principles)."

[14] Under "Attorneys' Fees," the contract states, "Should either I or the company . . . resort to legal proceedings to enforce this Agreement, the prevailing party in such legal proceeding shall be awarded, in addition to such other relief as may be granted, attorneys' fees and costs incurred in connection with such proceeding."

This court reviews a trial court's determination of the amount of fees awarded to a party legally entitled to such fees for abuse of discretion. Tradewell Grp., Inc. v. Mavis, 71 Wn. App. 120, 127, 857 P.2d 1053 (1993). There must be an actual conflict between the laws of Washington and the laws of another state before Washington courts will engage in a conflict of laws analysis. Freestone Capital Partners LP v. MKA Real Estate Opportunity Fund I, LLC, 155 Wn. App. 643, 664, 230 P.3d 625 (2010).

Guidance and Mangrio agreed at the trial court level that Virginia law governed the breach of contract claims. The trial court granted the defendants' motion for summary judgment, finding that the noncompete clauses were void as a matter of controlling Virginia law.

In Virginia law, there is a distinction between contracts that provide for reasonable attorney fees and attorney fees incurred. The use of the term "incurred" in the contract is a clear expression of the parties' intent to limit attorney fees to those actually incurred by the prevailing party. Safrin v, Travaini Pumps USA, Inc., 269 Va. 412, 419, 611 S.E.2d 352 (2005). Federal district courts have also interpreted Virginia law in this manner. See Airlines Reporting Corp. v. Sarrion Travel, Inc., 846 F. Supp. 2d 533, 539 (E.D. Va. 2012). There, the court found that when a contract states that a party is liable for attorney fees and costs actually incurred, it ensures that the fees subject to recovery are limited to those fees actually incurred, or will be incurred for that specific purpose. Id. In that case,

33

the court awarded attorney fees using the rate for the time actually expended. Id. at 540. And, because judgment had not been collected, it doubled the award in expectation of necessary future legal services. Id. at 540-41.

In Washington, when a contract includes an attorney fee provision, it is the terms of the contract to which the trial court should look to determine if such an award is warranted. Kaintz v. PLG, Inc., 147 Wn. App. 782, 790, 197 P.3d 710 (2008). Washington also heeds the method set forth in the contract to determine the award of attorney fees, only turning to the lodestar method in its absence. Crest Inc. v. Costco Wholesale Corp, 128 Wn. App 760, 773, 115 P.3d 349 (2005). Thus, we are not faced with an actual conflict of law. We look to the plain language of the terms in the attorney fees provision in the contract.

Here, the court awarded Mangrio attorney fees for actual hours spent on the breach of contract claims on which they prevailed. Instead of using the hourly rates customarily charged by Mangrio's counsel, the court used the hourly rates charged by Guidance's counsel. Therefore, the amount awarded, $182,135.25, does not reflect the fees actually incurred by Mangrio.

We reverse the award of fees, and remand to the trial court to determine an award of attorney fees for Mangrio that reflects the fees actually incurred in litigating the breach of contract claims.

## C. Attorney Fees on Appeal

All parties request attorney fees associated with this appeal. Pursuant to RAP 18.1, this court may award attorney fees requested by the party prevailing on an issue. This court awards attorney fees to the prevailing party on the basis of a private agreement, a statute, or a recognized ground of equity. Buck Mountain Owner's Ass'n v. Prestwich, 174 Wn. App. 702, 731, 308 P.3d 644 (2013). Guidance has prevailed on appeal and is entitle to reasonable attorney fees and costs, subject to compliance with RAP 18.1.

Appelwick, J.

WE CONCUR:

Spearman, J.

Leach, J.